

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-3-2001

# Robert S. v. Stetson School Inc.

Precedential or Non-Precedential:

Docket 00-1438

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Robert S. v. Stetson School Inc." (2001). *2001 Decisions.* Paper 146.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/146

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 3, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1438

ROBERT S., a minor

     Appellant

v.

STETSON SCHOOL, INC.; RICHARD J. ROBINSON,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS
EXECUTIVE DIRECTOR OF THE STETSON SCHOOL;
DAVE LAPRADE, INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS UNIT COUNSELOR, EMPLOYED BY THE
STETSON SCHOOL; RAY WILLIAMS, INDIVIDUALL Y AND
IN HIS OFFICIAL CAPACITY AS UNIT COUNSELOR,
EMPLOYED BY THE STETSON SCHOOL; MIKE
WILLIAMS, INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS UNIT COUNSELOR, EMPLOYED BY THE
STETSON SCHOOL; ROBERT MARTIN, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS UNIT COUNSELOR,
EMPLOYED BY THE STETSON SCHOOL

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(Dist. Court No. 99-cv-6710)
District Court Judge: Norma L. Shapiro

Argued: April 20, 2001

Before: ALITO, McKEE, Circuit Judges , and
ALARCON, Senior Circuit Judge[1]

_____

1. The Honorable Arthur L. Alarcon, United States Court of Appeals for
the Ninth Circuit, sitting by designation.

(Opinion Filed: July 3, 2001)

JONATHAN J. JAMES
ARTHUR B. JARRETT (argued)
James & Jarrett, P.C.
Stephen Girard Building - 7th Floor
21 South 12th Street
Philadelphia, PA 19107

Counsel for Appellant

JONATHAN D. WEISS
JOHN C. FARRELL (argued)
Marshall, Dennehey, Warner,
Coleman & Goggin
1845 Walnut Street
Philadelphia, PA 19103

Counsel for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

Robert S. ("Robert"), then a minor,filed this action
against the Stetson School ("Stetson"), several Stetson
employees, and others. His complaint asserted claims
against the school and its staff members under 42 U.S.C.
S 1983 for violating his federal constitutional rights by
subjecting him to physical and psychological abuse. 2 The
complaint also contained a variety of state-law claims
against these defendants. In this appeal, Robert challenges
the District Court's decision that Stetson and its staff did
not act under color of state law, as well as two of the
District Court's evidentiary rulings. We affirm.

I.

Robert was a victim of sexual abuse, and he in tur n
_____

2. The complaint also included claims against the City of Philadelphia,
the Philadelphia Department of Human Services, and city officials. These
claims are not before us in this appeal.

2

molested his younger brother. In 1993, when Robert was
13, the Philadelphia Court of Common Pleas found him to
be a "dependent child,"3see 42 PA. CONS. STAT. ANN. SS 6302,
_____

3. A "dependent child" is a child who:

  (1) is without proper parental car e or control, subsistence,
 education as required by law, or other car e or control necessary
for
 his physical, mental, or emotional health, or morals. A
 determination that there is a lack of pr oper parental care or
control
 may be based upon evidence of conduct by the par ent, guardian or
 other custodian that places the health, safety or welfare of the
child
 at risk, including evidence of the parent's, guardian's or other
 custodian's use of alcohol or a controlled substance that places
the
 health, safety or welfare of the child at risk;

  (2) has been placed for care or adoption in violation of law;

  (3) has been abandoned by his parents, guar dian, or other
 custodian;

  (4) is without a parent, guardian, or legal custodian;

  (5) while subject to compulsory school attendance is habitually
 and without justification truant from school;

  (6) has committed a specific act or acts of habitual disobedience
 of the reasonable and lawful commands of his parent, guardian or
 other custodian and who is ungovernable and found to be in need
 of care, treatment or supervision;

  (7) is under the age of ten years and has committed a delinquent
 act;

  (8) has been formerly adjudicated dependent, and is under the
 jurisdiction of the court, subject to its conditions or placements
and
 who commits an act which is defined as ungover nable in paragraph
 (6);

  (9) has been referred pursuant to section 6323 (relating to
 informal adjustment), and who commits an act which is defined as
 ungovernable in paragraph (6); or

  (10) is born to a parent whose par ental rights with regard to
 another child have been involuntarily terminated under 23 Pa.C.S.

S 2511 (relating to grounds for involuntary termination) within three years immediately preceding the date of birth of the child and conduct of the parent poses a risk to the health, safety or welfare of the child.

42 PA. CONS. STAT. ANN. S 6302.

6351, and placed him, with his mother's consent, in the
temporary custody of the Philadelphia Department of
Human Services ("DHS").4 At no time, however, did a court
find Robert to be a "delinquent child," see 42 PA. CONS. STAT.
ANN. SS 6302, 6352, nor was he convicted of any crime.

DHS decided that Robert would be best served by
enrolling him in Stetson, a school that specializes in the
treatment and education of juvenile sex of fenders. This
decision was not mandated by any court order and was
done with the consent of Robert's mother. DHS remained
Robert's legal custodian throughout his stay at Stetson and
was authorized to remove him at any time if it was not fully
satisfied with the services that Stetson was pr oviding. In
fact, at the urging of Robert's mother , DHS eventually did
remove Robert from Stetson in March 1997.

Stetson is a private, residential institution located in
Barre, Massachusetts. At the time of Robert's enrollment,
Stetson had approximately 55 residential students and four
or five commuter students. All of the Stetson students were
sex offenders. Incorporated under Massachusetts law and
licensed by the state, Stetson was governed by a board of
trustees, the members of which were elected by a board of
corporators. None of the members of the boar d of trustees
or the board of corporators were appointed by a government
entity, and none were federal, state, or local employees.

Stetson's buildings and property were all privately owned
and maintained, and Stetson had full control over its
admissions process. Admissions decisions wer e made by a
committee that reviewed applications and conducted
interviews of interested applicants. Stetson was not
obligated to accept any student. In fact, Stetson historically
refused to accept students with criminal r ecords and had

_____

4. Under 42 PA. CONS. STAT. ANN. S 6351, a court may permit a
"dependent child" to remain with his or her parents, guardian, or other
custodian subject to such conditions as the court pr escribes or transfer
temporary legal custody to a private person or or ganization or "[a]
public
agency authorized by law to receive and pr ovide care for the child."

4

successfully gone to court to exclude students whom it did not believe satisfied its stringent enrollment criteria.5

In pursuing its mission of providing tr eatment and education to juvenile sex offenders, Stetson worked in close concert with state and local governments. For example, Stetson and the City of Philadelphia entered into various financial and performance contracts r egarding Philadelphia children placed in the school. These contracts were entered into pursuant to the Pennsylvania Child Protective Services Act, 23 PA. CONS. STAT. ANN. S 6301 et seq. According to the testimony of Richard Robertson, Stetson's Executive Director, the City of Philadelphia paid Stetson slightly more than $200 per day for each student, an amount that was insufficient to cover the school's actual costs. Costs not covered by tuition were covered by grants from private foundations, other charitable contributions, and loans. Neither DHS nor the City of Philadelphia had any involvement in the day-to-day management of Stetson. That task was left entirely to the Stetson staf f.

Stetson provided a structured envir onment for its students. Students were not permitted to leave campus without supervision, were assigned bed times, were generally awakened at approximately the same time, and ate their meals at times set by the staff. Although the school did not require uniforms, it had a dress code.6 Students were allowed to use both computers and telephones, but when students used a telephone, a Stetson staff member was normally in the r oom for therapeutic reasons.7 Students wer e allowed to write and receive mail.

_____

5. According to the testimony of Richar d Robertson, the Executive Director of Stetson, on one occasion a court attempted to issue an order placing a child at Stetson. The school objected and ultimately prevailed in its effort to keep the student out of Stetson.
6. Richard Robinson testified, "W e don't allow T-shirts with marijuana symbols on them, we don't allow Grateful Dead T -shirts, we don't allow symbols and things that are sexualized in natur e; we don't allow tank tops and short-shorts in the dining room for health code reasons."

7. Richard Robinson testified that a Stetson staff member is normally in the room with students, but not actually on the phone. According to Robinson, "Sometimes children can get very upset when they're talking to parents or relatives or whoever they'r e talking to on the phone, we've had children who have smashed windows and attacked staff." Appendix at 186B.

5

Some were also allowed to leave campus with supervision and to go home for vacations. Stetson did not employ any mechanical or chemical restraints; the buildings did not have bars on the windows; and the school did not per mit corporal or physical punishment.

Robert alleged that Stetson staff members subjected him to physical and psychological abuse, including wr estling with him and kicking and punching him. Robert claimed that this conduct violated Stetson's policy against "horseplay"[8] and sever ely disrupted his treatment. He reported this alleged abuse to a Stetson therapist in February 1997. After an internal investigation, Stetson concluded that three of its counselors had violated the anti-horseplay policy and subsequently suspended them. The Commonwealth of Massachusetts also investigated and decided that Stetson had acted appropriately in punishing the counselors.

Not satisfied with the school's response, Robert filed this action, asserting claims under S 1983 for violations of his constitutional rights, as well as state-law claims for intentional infliction of emotional distress, assault and battery, false arrest, false imprisonment, invasion of privacy, negligence, and state-law civil rights violations. On motion of the Stetson defendants, the District Court bifurcated the trial. After hearing evidence on the question of state action, the Court made findings of fact r elated to that question and held that the Stetson defendants were not state actors. A trial was then held on Robert's state-law claims, but the jury did not award him any r elief, and Robert took this appeal.

_____

8. The anti-horseplay policy was included in the employee manual as part of a list of unacceptable behaviors. The policy provides:

> "Horseplay" or "roughhousing" is physical playing or teasing that
> has the real potential to lead to injury or afight between students
> or between students and staff. If a staf f identifies the play between
> students as "horseplay" or "roughhousing", the student must stop
> that kind of play or interacting. Too often"horseplay" or
> "roughhousing" leads to dangerous play or fighting.

6

II.

Embodying the state-action requirement of the Fourteenth Amendment, see Lugar v. Edmondson Oil Co., 457 U.S. 922, 934-35 (1982); United States v. Price, 383 U.S. 787, 794 n.7 (1966), 42 U.S.C. S 1983 pr ovides a cause of action that may be asserted against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . of any state . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . " (emphasis added). Thus, a plaintiff in a section 1983 action bears the threshold burden of proving that "the alleged deprivation was committed by a person acting under color of state law." Mark v. Borough of Hatboro, 51 F .3d 1137, 1141 (3d Cir. 1995) (quoting Moore v. Tartle, 986 F.2d 682, 685 (3d Cir. 1993)).

As noted, the Stetson School is a private institution, and thus the school and its employees do not for mally wield the authority of the state. There are, however , some circumstances in which "seemingly private behavior `may fairly be treated as that of the State itself.' " Brentwood Acad. v. Tennessee Secondary Sch., 121 S.Ct. 924, 930 (2001) (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349 (1974)). The Supreme Court r ecently wrote that there are "a host of facts that can bear on the fairness of such an attribution" and that "[a]midst such variety, examples may be the best teachers." Id. W e therefore begin our analysis of the state-action question in this case with the Supreme Court's decision in Rendell-Baker v. Kohn, 457 U.S. 830 (1982), which provides the example that is most closely analogous to the present case.

Rendell-Baker concerned the New Perspectives School, an institution with many similarities to the Stetson School. The New Perspectives School was a nonprofit institution that specialized in treating and educating students who had experienced difficulty completing public high schools (largely due to drug, alcohol, and behavioral problems). New Perspectives was a private school, located on private property, and operated by a private boar d of directors. Students who attended New Perspectives were generally

7

referred by local school committees or the state department of health. The school committees paid New Perspectives for its services, and at least 90% of New Perspectives' operating budget came from public funds. To be eligible for this funding, New Perspectives was required to comply with various local and state regulations. The school also entered into contracts with governmental bodies that r eferred students to the school.

Applying the factors discussed in Blum v. Y aretsky, 457 U.S. 991 (1982), a case handed down on the same day as Rendell-Baker, the Supreme Court held that New Perspectives' discharge of employees was not state action. First, the Court rejected the argument that the school was a state actor because "virtually all of [its] income was derived from government funding." Rendell-Baker, 457 U.S. at 840. The Court stated that "[a]cts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." Id . at 841. The Court likewise found no merit in the argument that extensive state regulation of the school was sufficient to make it a state actor, because the challenged conduct by New Perspectives "was not compelled or even influenced by any state regulation." Id. Next, the Court concluded that New Perspectives was not performing a function that had been " `traditionally the exclusive prerogative of the State.' " Id. at 842 (quoting Jackson, 419 U.S. at 353 (emphasis added in Rendell-Baker)). The Court recognized that"the education of maladjusted high school students is a public function" and that state law required that services be provided for these students at public expense. 457 U.S. at 842; see also id. at 845 (Marshall, J., dissenting). But the Court noted that "until recently the State had not undertaken to provide education for students who could not be served by the traditional public schools," and the Court commented: "That a private entity performs a function which serves the public does not make its acts state action." Id. Finally, the Court rejected the argument that ther e was a "symbiotic relationship" between New Perspectives and the state sufficient to make New Perspectives a state actor . The Court observed that "[t]he school's fiscal r elationship with the

8

State [was] not different fr om that of many contractors performing services for the gover nment." Id.

In light of Rendell–Baker, it is appar ent that many of the factors upon which Robert relies here ar e insufficient to establish state action. For example, it is clear that Stetson's receipt of government funds did not make it a state actor. Similarly, although Robert relies on the detailed requirements set out in DHS's contracts with Stetson, those requirements are also insufficient because they did not "compel or even influence" the conduct on the part of the Stetson staff that Robert challenged. See American Mfrs. Mutual Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999) ("mere fact that a business is subject to state regulation does not by itself convert its action into that of the State"); Black, 985 F.2d at 710–11 (pervasive regulation"made no difference" because the complained of conduct was "not compelled or even influenced by any state r egulation").

Robert argues, however, that the Stetson School, unlike the New Perspectives School, performed a function that has traditionally been the exclusive province of the state. Indeed, Robert's brief forswears reliance on any other theory of state action. See Appellant's Br . at 30 ("Only the Public Function Test is useful and relevant in reviewing the state actorship determination by the District Court in the present matter on appeal."). As we have noted, this test imposes a "rigorous standard" that is "rarely . . . satisfied," Mark, 51 F.3d at 1142, for "[w]hile many functions have been traditionally performed by gover nments, very few have been `exclusively reserved to the State.' " Flagg Brothers Inc. v. Lefkowitz, 436 U.S. 149, 158 (1978).

In this case, Robert has not made the requisite showing. As was true of the New Perspectives School in Rendell–Baker, the record here does not show that the Stetson School performed a function that has been traditionally the exclusive province of the state. In fact, the undisputed evidence showed that the only schools that of fered services similar to those provided by Stetson wer e private schools. See Appendix at 149B (testimony of Richar d Robinson indicating that he is unaware of any public schools that specialize in educating and treating sex of fenders). The mere fact that Stetson "perfor ms a function which serves

9

the public does not makes its acts state action." Rendell–Baker, 457 U.S. at 842.

This conclusion is supported by our decision in Black by Black v. Indiana Area Sch. Dist., 985 F .2d 707 (3d Cir. 1993), a case involving a private bus company with which a school district had contracted to transport students to and from school. We found that case to be indistinguishable from Rendell–Baker, concluding that

> [w]hile [the company and the individual defendants affiliated with it] were carrying out a state program at state expense, they were not perfor ming a function that has been "traditionally the exclusive prer ogative of the state" and there was no state regulation that "compelled or even influenced" the conduct which is alleged to have violated plaintiffs' constitutional rights.

Black by Black, 985 F.2d at 710–11. W e went on to state that "as in Rendell–Baker, the cooperation between the [state and the contractor] was only that appr opriate to the execution of the subject matter of the contract and the contractor's `fiscal relationship with the State is not different from that of many contractors performing services for the state.' " Id. at 711 (quoting Rendell–Baker, 457 U.S. at 843). Finally, although school busing is commonly thought of as a traditional state function, we concluded that the "state contractor was not providing a service within the exclusive province of the state." Id. We believe that the facts of the present case warrant the same conclusion.

Robert appears to suggest that this case is dif ferent because the services that Stetson provided wer e services that DHS was required by state law to pr ovide. See Appellant's Br. at 21, 24, 46. This very ar gument, however, appears to have been rejected in Rendell–Baker. In dissent in that case, Justice Marshall highlighted the fact that the New Perspectives School "provide[d] a service that the State [was] required to provide" under a state statute enacted a few years earlier, 457 U.S. at 849 (Marshall, J., dissenting); see also id. at 845, but the Court was not persuaded. See 457 U.S. at 842 ("That legislative policy choice in no way makes these services the exclusive province of the State.").

10

Stressing the restrictions placed on students' liberty while attending the Stetson School, Robert ar gues that "the involuntary nature of [his] commitment" made his situation there "entirely analogous to the situation of either a prisoner or mentally committed individual held against his/her will." Appellant's Br. at 44. Ther e is, however, no factual basis for analogizing Robert's situation at the Stetson School to that of a prisoner or a person who has been involuntarily civilly committed. Whether or not Robert, a minor at the time in question, personally wanted to attend the Stetson School, his legal custodian, DHS, wanted him placed there, and his mother consented. Thus, his enrollment at Stetson was not "involuntary" in the sense relevant here, i.e., he was not deprived of his liberty in contravention of his legal custodian's (or his mother's) wishes.9

Finally, we do not believe that the present case is comparable to Milonas v. Williams, 691 F.2d 931 (10th Cir. 1982), a case that Robert believes is directly on point. In Milonas, a class consisting of students at the Provo Canyon School for Boys brought section 1983 claims against the school and members of its staff, alleging that inhumane treatment at the school violated the Constitution. The Provo Canyon School, as described in the Tenth Cir cuit opinion, was an unusual facility. A private facility for boys with severe physical, psychological, and emotional problems, the school was described in the District Court opinion, which the Tenth Circuit quoted, as " `not a school in the traditional, ordinary, classroom sense.' " 691 F.2d at 935. Although the school did offer classes, the District Court

_____

9. The power that DHS exercised over Robert is not comparable to the power that a state exercises over a person whose liberty is restricted as a result of a criminal conviction or involuntary civil commitment. The latter power is quintessentially governmental, but a legal guardian's authority over a minor is not. The Juvenile Act, on which Robert relies, provides that temporary custody of a dependent child such as Robert may be transferred, not only to an authorized"public agency" such as DHS, see 42 PA. CONS. STAT. ANN. S 6351(a)(2)(iii), but also to "[a]ny individual resident within or without [the] Commonwealth" who is found to be qualified or to a qualified "private organization." 42 PA. CONS. STAT.
ANN. S 6351(a)(2)(i) and (ii).

11

observed, the school was " `also a corr ectional and detention facility.' " While students were generally admitted at the insistence of one or both of their parents, others were "received at the school directly fr om juvenile courts and probation officers from across the nation." Id. at 936. Conditions at the school were unusually harsh and restrictive. Id. The District Court wr ote:

> Students are restricted to the grounds. Students are confined. Some students are locked in and locked up with varying degrees of personal liberty r estored as each progresses through the institutional program. If a student leaves without permission, he is hunted down, taken into custody and returned. . . .
>
> Regardless of origin, condition or motivation, once arrived, each person during the beginning phases of the school program was locked in, isolated fr om the outside world, and whether anti-social, crippled or learning disabled, was subject to mandated physical standing day after day after day to promote"right thinking" and "social conformity." Mail was censored. Visitors were discouraged. Disparaging r emarks concerning the institution were pr ohibited and punished. To "graduate" from confinement to a more liberated phase, one had to "pass" a lie detector test relating to "attitude," "truthfulness" and "future conduct." Some failed to pass and remained in confinement for extended periods of time.

Id. at 935-36.

The Tenth Circuit concluded that the state "ha[d] so insinuated itself with the Provo Canyon School as to be considered a joint participant in the of fending actions." Id. at 940. The Court relied on the involuntary commitment of some students, the school's detailed contracts with the school districts, the school's receipt of substantial state funding, and extensive state regulation. See id. Recognizing that the New Perspectives School in Rendell-Baker was "indeed quite similar" to the Provo Canyon School, the Tenth Circuit attempted to distinguish the cases by noting that the plaintiffs in Rendell-Baker were employees of the school, whereas the plaintiffs in Milonas were students,

12

"some of whom have been involuntarily placed in the school by state officials who were aware of, and approved of, certain of the practices which the district court . . . enjoined." Id. at 940.

Milonas is not binding on us, and we cannot agree entirely with the court's reasoning. The Milonas court's reliance on "significant state funding of tuition" and the detailed contracts between the school and local school districts appears to us to be squarely inconsistent with Rendell-Baker. Moreover, we ar e uncertain what the Milonas court had in mind when it sought to distinguish Rendell-Baker on the ground that the plaintif fs in that case were school employees, rather than students. Ther e are, of course, circumstances in which this distinction might matter. (For example, a state directive might require a private entity to engage in the conduct challenged by a student while imposing no such requirement regarding conduct challenged by an employee.) But it is unclear why the Milonas court thought that it was important that the plaintiffs in the case before it wer e students. It is possible that the Milonas court took this view because it believed that some state officials "were awar e of, and approved of " certain of the Provo Canyon School's practices concerning the treatment of students. It is not clear that even such awareness and approval would be enough to establish state action,10 but if this is not what the Milonas court had in mind, the significance of the fact that the plaintiffs were students is obscure.

In any event, we need not decide whether we would agree with the Tenth Circuit on the facts pr esented in Milonas, because the case now before us is quite dif ferent. Here, Robert was not "involuntarily placed in the school by state officials who were aware of, and appr oved of " the practices attacked in Robert's complaint. Robert was enr olled at

_____

10. There is tension between Milonas's reliance on such awareness and approval as the basis for finding state action and the Supreme Court's holding in San Francisco Arts & Athletics v. U.S.O.C., 483 U.S. 522, 547 (1987) (quoting Blum, 457 U.S. at 1004-5), that governmental " `approval of or acquiescence in' " the challenged conduct was not enough to establish state action.

13

Stetson by his legal custodian and with his mother's consent, and we are aware of no evidence that any state officials were aware or approved of the conduct by the members of the Stetson staff that forms the basis of Robert's claims -- much less any evidence that they "provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the [state]." Blum , 457 U.S. at 1004; see also San Francisco Arts & Athletics v. U.S.O.C. , 483 U.S. 522, 546 (1987).

Moreover, for what it is worth, ther e is simply no evidence that Stetson subjected its students to anything approaching the conditions at the Provo Canyon School. As far as the record here reveals, Stetson students were not placed in solitary confinement, discouraged fr om seeing visitors, required to take lie detector tests, or subjected to censorship of their mail. On the contrary, it is undisputed that Robert was allowed to leave campus with an instructor, had regular contact with his family (including frequent visits with his mother and step-father), was allowed to leave campus with his family, and was even allowed to go home for vacations.

Robert emphasizes the fact that Stetson students wer e not allowed to leave the school grounds without permission and that, if they did, the school would attempt to locate and return them, with the help of the local police department if necessary. See Appellant's Br . at 38-39. He argues that his "complete inability to leave the Stetson School without having a bench warrant issued for his detention, effectively ma[de] him a`prisoner', much more analogous to an inmate, than to any other situation." Id. at 39. In response, Stetson states:

> In the event that a student were to leave campus without permission, Stetson, like all r esponsible private or public schools, would notify local police for the student's own welfare and for the protection of the community. Stetson would not issue a warrant and arrest order because Stetson lacked the jurisdictional basis and the legal authority on its own to invoke custodial proceedings.

14

Appellees's Br. at 11 (citations to appendix omitted).

Robert has not referred us to any evidence in the record that supports his assertion that the school did mor e than simply notify the police department if a student left without permission.11 Nor has he referred us to any provision of Massachusetts statute or common law that gave Stetson any greater authority with respect to a missing student than is enjoyed by any of the state's other privately owned and run residential schools.

In sum, whether or not we would follow Milonas , we are satisfied that that case is easily distinguishable from the case before us. Particularly in light of the Supreme Court's decision in Rendell-Baker, we agree with the District Court that Robert failed to show that the challenged actions of the Stetson staff may be fairly attributed to the state.

III.

Robert also challenges two evidentiary rulings made by the District Court during the trial on his state-law claims. First, he argues that the District Court err ed by limiting the expert testimony of Anne Wolbert Burgess, D.N.S., who was prepared to testify that the behavior to which Robert was subjected at Stetson constituted child abuse. The District Court accepted Burgess as an expert in child abuse, but the Court ruled that an expert opinion on the question

_____

11. Robert's brief provides two citations. The first is to the first page of
the transcript of the hearing before the District Court. Apparently, by citing to this page, Robert intended to cite the entire hearing. His second
citation is to a page of the District Court opinion stating that "Plaintiff
also proved that Stetson contacts the police when a child leaves the premises without permission." The District Court did not make any reference to the issuance of a warrant, and in the next sentence, the Court found that, despite the "obviously significant limitations on the freedom of students enrolled at Stetson," it did not believe that Stetson was "fulfilling the traditional public function of incarcerating criminals."
Id. The District Court pointed out that Robert was never adjudicated a criminal, the decision to place him at Stetson was made with the advice and support of his mother, and many of the r estrictions imposed on students at Stetson were no greater than those imposed at any strict private boarding school. See id.

whether specific conduct constituted child abuse would not be helpful to the jury under Fed. R. Evid. 702. Mor oever, the Court concluded that testimony by Burgess on this point would result in "undue delay, waste of time, or needless presentation of cumulative evidence" within the meaning of Fed. R. Evid. 403, and the Court ther efore precluded such testimony. In addition, the Court ruled that Burgess was not qualified to "render an opinion diagnosing plaintiff with post-traumatic stress disorder" and that "such testimony would be unnecessarily cumulative to the testimony of plaintiff 's other experts." As a result of these rulings, Burgess's testimony was limited to the treatment that she believed would have been best for Robert.

Robert argues that the District Court err ed in limiting Burgess's testimony. He claims that Bur gess's testimony was offered to "help explain to the jury the ramifications, and implications, of uninvited physical contact by staff with Plaintiff, in the guise of horseplay." Robert's Brief at 52. More specifically, he argues that expert testimony was necessary to explain that children "who act out sexually" and who have been the victims of sexual abuse "ar e at an increased risk for harm caused by . . . uninvited inappropriate physical contact." See id. at 54. Therefore, he contends that the District Court made it impossible for him adequately to explain the seriousness of the horseplay by the Stetson staff. Id. at 55-56.

We review a District Court's decision to admit or reject testimony under Rule 403 for abuse of discretion, and, we will not reverse such a ruling "unless it is`arbitrary and irrational.' " Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 187 (3d Cir. 1990) (quoting United States v. DePeri, 778 F.2d 963, 973-74 (3d Cir. 1985)), cert. denied, 501 U.S. 1217 (1991). We hold that the District Court's ruling limiting Burgess's testimony under Fed. R. Evid. 403 was within the proper bounds of its discretion.

In addition to Burgess, two other experts testified on Robert's behalf at trial. See Stetson's Brief at 58. These two witnesses, Edward J. Doughtery and Robert Pr entky, both psychologists, testified at length about the impact that the alleged physical and mental abuse of Robert could have on someone with his history. See Appendix at 303B-309B

16

(portion of Doughtery's testimony); 739B–746B (portion of Prentky's testimony). Both experts explained that someone like Robert, who has been the victim and perpetrator of sexual abuse, is particularly susceptible to har m caused by inappropriate contact. See id. at 307B–308B (explaining that, prior to entering Stetson, Robert had a "brittle personality due to numerous problems in his early development" and that the conduct at Stetson "caused him a great deal of stress and problems"); Appendix at 744B ("Child abuse, virtually by definition, involves some violation of boundaries. . . . Survivors of childhood physical abuse grow up with an awareness, a knowledge that their personal boundaries are highly permeable, so that learning to trust the integrity of one's own boundaries is pr ofoundly important. . . . When a therapist violates personal space of survivors, it recapitulates all of the earlier experiences that are boundary violations."). This testimony by Doughtery and Prentky addressed the same issues that Robert sought to address through Burgess's testimony. Therefore, the District Court had a reasonable basis for r egarding that testimony as cumulative, and the District Court did not abuse its discretion in limiting Burgess's testimony.

Robert next maintains that the District Court err ed in excluding certain evidence of prior bad acts by members of the Stetson staff. This included evidence of an incident in which a staff member (not one of the defendants) held a student over a balcony railing, evidence of an incident in which a staff member drove recklessly on campus with students in the van, evidence of the use of inappr opriate language by staff members, and evidence of other incidents that did not involve Robert or the defendants. Robert argues that this evidence was not offer ed to show that the defendants acted in conformity with it but rather to persuade the jury that Stetson had a permissive attitude regarding inappropriate behavior dir ected at students by staff. See Appellant's Br. at 60–61. The District Court excluded the evidence of the reckless driving incident, the incident in which a staff member held a student over a railing, and any other prior incidents that did not involve the plaintiff. See Appendix at 23. However, the Court allowed evidence of the use of inappropriate language by any of the defendants. See id.

17

Because of the distinct possibility that the jury likely would have considered the excluded evidence for precisely the purpose that Fed. R. Evid. 404(b) prohibits, i.e., to show that the defendants acted in conformity with these prior bad acts on the occasions alleged by Robert, the District Court had a reasonable basis for ruling that admission of this evidence created a danger of unfair prejudice to the defendants under Fed. R. Evid. 403. In addition, since the prior acts did not involve any of the individual defendants or Robert and did not occur during the same time period as Robert's claimed abuse, 12 the District Court had a reasonable basis for concluding that the probative value of the evidence was not gr eat and for excluding it under Rule 403.

IV.

For the reasons discussed above, we affir m the judgment of the District Court.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit
_____

12. The balcony incident occurred befor e Robert came to Stetson and the reckless driving incident occurred prior to the time when Robert claims that his abuse began.

18