256 F.3d 159 (3rd Cir. 2001)
 ROBERT S., A MINOR APPELLANT
v.
STETSON SCHOOL, INC.; RICHARD J. ROBINSON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE STETSON SCHOOL; DAVE LAPRADE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS UNIT COUNSELOR, EMPLOYED BY THE STETSON SCHOOL; RAY WILLIAMS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS UNIT COUNSELOR, EMPLOYED BY THE STETSON SCHOOL; MIKE WILLIAMS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS UNIT COUNSELOR, EMPLOYED BY THE STETSON SCHOOL; ROBERT MARTIN, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS UNIT COUNSELOR, EMPLOYED BY THE STETSON SCHOOL
 No. 00-1438
 UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
 Argued April 20, 2001
July 3, 2001
 
 1
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA (Dist. Court No. 99-CV-6710) District Court Judge: Norma L. ShapiroJonathan J. James Arthur B. Jarrett (argued) James & Jarrett, P.C. Stephen Girard Building - 7th Floor 21 South 12th Street Philadelphia, PA 19107 Counsel for Appellant
 
 
 2
 Jonathan D. Weiss John C. Farrell (argued) Marshall, Dennehey, Warner, Coleman & Goggin 1845 Walnut Street Philadelphia, PA 19103 Counsel for Appellees
 
 
 3
 Before: Alito, McKEE, Circuit Judges, and Alarcon, Senior Circuit Judge[1]
 
 OPINION OF THE COURT
 Alito, Circuit Judge
 
 4
 Robert S. ("Robert"), then a minor, filed this action against the Stetson School ("Stetson"), several Stetson employees, and others. His complaint asserted claims against the school and its staff members under 42 U.S.C. S 1983 for violating his federal constitutional rights by subjecting him to physical and psychological abuse.[2] The complaint also contained a variety of state-law claims against these defendants. In this appeal, Robert challenges the District Court's decision that Stetson and its staff did not act under color of state law, as well as two of the District Court's evidentiary rulings. We affirm.
 
 I.
 
 5
 Robert was a victim of sexual abuse, and he in turn molested his younger brother. In 1993, when Robert was 13, the Philadelphia Court of Common Pleas found him tobe a "dependent child,"[3] see 42 PA. CONS. STAT. ANN. SS 6302, 6351, and placed him, with his mother's consent, in the temporary custody of the Philadelphia Department of Human Services ("DHS").[4] At no time, however, did a court find Robert to be a "delinquent child," see 42 PA. CONS. STAT. ANN. SS 6302, 6352, nor was he convicted of any crime.
 
 
 6
 DHS decided that Robert would be best served by enrolling him in Stetson, a school that specializes in the treatment and education of juvenile sex of fenders. This decision was not mandated by any court order and was done with the consent of Robert's mother. DHS remained Robert's legal custodian throughout his stay at Stetson and was authorized to remove him at any time if it was not fully satisfied with the services that Stetson was providing. In fact, at the urging of Robert's mother, DHS eventually did remove Robert from Stetson in March 1997.
 
 
 7
 Stetson is a private, residential institution located in Barre, Massachusetts. At the time of Robert's enrollment, Stetson had approximately 55 residential students and four or five commuter students. All of the Stetson students were sex offenders. Incorporated under Massachusetts law and licensed by the state, Stetson was governed by a board of trustees, the members of which were elected by a board of corporators. None of the members of the board of trustees or the board of corporators were appointed by a government entity, and none were federal, state, or local employees.
 
 
 8
 Stetson's buildings and property were all privately owned and maintained, and Stetson had full control over its admissions process. Admissions decisions were made by a committee that reviewed applications and conducted interviews of interested applicants. Stetson was not obligated to accept any student. In fact, Stetson historically refused to accept students with criminal records and had successfully gone to court to exclude students whom it did not believe satisfied its stringent enrollment criteria.[5]
 
 
 9
 In pursuing its mission of providing treatment and education to juvenile sex offenders, Stetson worked in close concert with state and local governments. For example, Stetson and the City of Philadelphia entered into various financial and performance contracts regarding Philadelphia children placed in the school. These contracts were entered into pursuant to the Pennsylvania Child Protective Services Act, 23 PA. CONS. STAT. ANN. S 6301 et seq. According to the testimony of Richard Robertson, Stetson's Executive Director, the City of Philadelphia paid Stetson slightly more than $200 per day for each student, an amount that was insufficient to cover the school's actual costs. Costs not covered by tuition were covered by grants from private foundations, other charitable contributions, and loans. Neither DHS nor the City of Philadelphia had any involvement in the day-to-day management of Stetson. That task was left entirely to the Stetson staff.
 
 
 10
 Stetson provided a structured environment for its students. Students were not permitted to leave campus without supervision, were assigned bed times, were generally awakened at approximately the same time, and ate their meals at times set by the staff. Although the school did not require uniforms, it had a dress code.[6] Students were allowed to use both computers and telephones, but when students used a telephone, a Stetson staff member was normally in the room for therapeutic reasons.[7] Students were allowed to write and receive mail.
 
 
 11
 Some were also allowed to leave campus with supervision and to go home for vacations. Stetson did not employ any mechanical or chemical restraints; the buildings did not have bars on the windows; and the school did not permit corporal or physical punishment.
 
 
 12
 Robert alleged that Stetson staff members subjected him to physical and psychological abuse, including wrestling with him and kicking and punching him. Robert claimed that this conduct violated Stetson's policy against "horseplay"[8] and severely disrupted his treatment. He reported this alleged abuse to a Stetson therapist in February 1997. After an internal investigation, Stetson concluded that three of its counselors had violated the anti-horseplay policy and subsequently suspended them. The Commonwealth of Massachusetts also investigated and decided that Stetson had acted appropriately in punishing the counselors.
 
 
 13
 Not satisfied with the school's response, Robert filed this action, asserting claims under S 1983 for violations of his constitutional rights, as well as state-law claims for intentional infliction of emotional distress, assault and battery, false arrest, false imprisonment, invasion of privacy, negligence, and state-law civil rights violations. On motion of the Stetson defendants, the District Court bifurcated the trial. After hearing evidence on the question of state action, the Court made findings of fact related to that question and held that the Stetson defendants were not state actors. A trial was then held on Robert's state-law claims, but the jury did not award him any relief, and Robert took this appeal.
 
 II.
 
 14
 Embodying the state-action requirement of the Fourteenth Amendment, see Lugar v. Edmondson Oil Co., 457 U.S. 922, 934-35 (1982); United States v. Price, 383 U.S. 787, 794 n.7 (1966), 42 U.S.C. S 1983 provides a cause of action that may be asserted against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . of any state . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . " (emphasis added). Thus, a plaintiff in a section 1983 action bears the threshold burden of proving that "the alleged deprivation was committed by a person acting under color of state law." Mark v. Borough of Hatboro, 51 F .3d 1137, 1141 (3d Cir. 1995) (quoting Moore v. Tartle, 986 F.2d 682, 685 (3d Cir. 1993)).
 
 
 15
 As noted, the Stetson School is a private institution, and thus the school and its employees do not formally wield the authority of the state. There are, however, some circumstances in which "seemingly private behavior `may fairly be treated as that of the State itself.' " Brentwood Acad. v. Tennessee Secondary Sch., 121 S.Ct. 924, 930 (2001) (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349 (1974)). The Supreme Court recently wrote that there are "a host of facts that can bear on the fairness of such an attribution" and that "[a]midst such variety, examples may be the best teachers." Id. We therefore begin our analysis of the state-action question in this case with the Supreme Court's decision in Rendell-Baker v. Kohn, 457 U.S. 830 (1982), which provides the example that is most closely analogous to the present case.
 
 
 16
 Rendell-Baker concerned the New Perspectives School, an institution with many similarities to the Stetson School. The New Perspectives School was a nonprofit institution that specialized in treating and educating students who had experienced difficulty completing public high schools (largely due to drug, alcohol, and behavioral problems). New Perspectives was a private school, located on private property, and operated by a private board of directors. Students who attended New Perspectives were generally referred by local school committees or the state department of health. The school committees paid New Perspectives for its services, and at least 90% of New Perspectives' operating budget came from public funds. To be eligible for this funding, New Perspectives was required to comply with various local and state regulations. The school also entered into contracts with governmental bodies that referred students to the school.
 
 
 17
 Applying the factors discussed in Blum v. Yaretsky, 457 U.S. 991 (1982), a case handed down on the same day as Rendell-Baker, the Supreme Court held that New Perspectives' discharge of employees was not state action. First, the Court rejected the argument that the school was a state actor because "virtually all of [its] income was derived from government funding." Rendell-Baker, 457 U.S. at 840. The Court stated that "[a]cts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." Id. at 841. The Court likewise found no merit in the argument that extensive state regulation of the school was sufficient to make it a state actor, because the challenged conduct by New Perspectives "was not compelled or even influenced by any state regulation." Id. Next, the Court concluded that New Perspectives was not performing a function that had been " `traditionally the exclusive prerogative of the State.' " Id. at 842 (quoting Jackson, 419 U.S. at 353 (emphasis added in Rendell-Baker)). The Court recognized that "the education of maladjusted high school students is a public function" and that state law required that services be provided for these students at public expense. 457 U.S. at 842; see also id. at 845 (Marshall, J., dissenting). But the Court noted that "until recently the State had not undertaken to provide education for students who could not be served by the traditional public schools," and the Court commented: "That a private entity performs a function which serves the public does not make its acts state action." Id. Finally, the Court rejected the argument that there was a "symbiotic relationship" between New Perspectives and the state sufficient to make New Perspectives a state actor. The Court observed "[t] he school's fiscal relationship with the State [was] not different from that of many contractors performing services for the government." Id.
 
 
 18
 In light of Rend ell-Baker, it is apparent that many of the factors upon which Robert relies here are insufficient to establish state action. For example, it is clear that Stetson's receipt of government funds did not make it a state actor. Similarly, although Robert relies on the detailed requirements set out in DOS's contracts with Stetson, those requirements are also insufficient because they did not "compel or even influence" the conduct on the part of the Stetson staff that Robert challenged. See American Mfrs. Mutual Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999) ("mere fact that a business is subject to state regulation does not by itself convert its action into that of the State"); Black, 985 F.2d at 710-11 (pervasive regulation "made no difference" because the complained of conduct was "not compelled or even influenced by any state regulation").
 
 
 19
 Robert argues, however, that the Stetson School, unlike the New Perspectives School, performed a function that has traditionally been the exclusive province of the state. Indeed, Robert's brief forswears reliance on any other theory of state action. See Appellant's Br. at 30 ("Only the Public Function Test is useful and relevant in reviewing the state actorship determination by the District Court in the present matter on appeal."). As we have noted, this test imposes a "rigorous standard" that is "rarely . . . satisfied," Mark, 51 F.3d at 1142, for "[w]hile many functions have been traditionally performed by governments, very few have been `exclusively reserved to the State.' " Flagg Brothers Inc. v. Lefkowitz, 436 U.S. 149, 158 (1978).
 
 
 20
 In this case, Robert has not made the requisite showing. As was true of the New Perspectives School in Rendell-Baker, the record here does not show that the Stetson School performed a function that has been traditionally the exclusive province of the state. In fact, the undisputed evidence showed that the only schools that offered services similar to those provided by Stetson were private schools. See Appendix at 149B (testimony of Richard Robinson indicating that he is unaware of any public schools that specialize in educating and treating sex of fenders). The mere fact that Stetson "performs a function which serves the public does not makes its acts state action." Rendell-Baker, 457 U.S. at 842.
 
 
 21
 This conclusion is supported by our decision in Black by Black v. Indiana Area Sch. Dist., 985 F .2d 707 (3d Cir. 1993), a case involving a private bus company with which a school district had contracted to transport students to and from school. We found that case to be indistinguishable from Rendell-Baker, concluding that
 
 
 22
 [w]hile [the company and the individual defendants affiliated with it] were carrying out a state program at state expense, they were not performing a function that has been "traditionally the exclusive prerogative of the state" and there was no state regulation that "compelled or even influenced" the conduct which is alleged to have violated plaintiffs' constitutional rights.
 
 
 23
 Black by Black, 985 F.2d at 710-11. We went on to state that "as in Rendell-Baker, the cooperation between the [state and the contractor] was only that appropriate to the execution of the subject matter of the contract and the contractor's `fiscal relationship with the State is not different from that of many contractors performing services for the state.' " Id. at 711 (quoting Rendell-Baker, 457 U.S. at 843). Finally, although school busing is commonly thought of as a traditional state function, we concluded that the "state contractor was not providing a service within the exclusive province of the state." Id. We believe that the facts of the present case warrant the same conclusion.
 
 
 24
 Robert appears to suggest that this case is different because the services that Stetson provided were services that DHS was required by state law to provide. See Appellant's Br. at 21, 24, 46. This very argument, however, appears to have been rejected in Rendell-Baker. In dissent in that case, Justice Marshall highlighted the fact that the New Perspectives School "provide[d] a service that the State [was] required to provide" under a state statute enacted a few years earlier, 457 U.S. at 849 (Marshall, J., dissenting); see also id. at 845, but the Court was not persuaded. See 457 U.S. at 842 ("That legislative policy choice in no way makes these services the exclusive province of the State.").
 
 
 25
 Stressing the restrictions placed on students' liberty while attending the Stetson School, Robert argues that "the involuntary nature of [his] commitment" made his situation there "entirely analogous to the situation of either a prisoner or mentally committed individual held against his/her will." Appellant's Br. at 44. There is, however, no factual basis for analogizing Robert's situation at the Stetson School to that of a prisoner or a person who has been involuntarily civilly committed. Whether or not Robert, a minor at the time in question, personally wanted to attend the Stetson School, his legal custodian, DHS, wanted him placed there, and his mother consented. Thus, his enrollment at Stetson was not "involuntary" in the sense relevant here, i.e., he was not deprived of his liberty in contravention of his legal custodian's (or his mother's) wishes.[9]
 
 
 26
 Finally, we do not believe that the present case is comparable to Milonas v. Williams, 691 F.2d 931 (10th Cir. 1982), a case that Robert believes is directly on point. In Milonas, a class consisting of students at the Provo Canyon School for Boys brought section 1983 claims against the school and members of its staff, alleging that inhumane treatment at the school violated the Constitution. The Provo Canyon School, as described in the Tenth Circuit opinion, was an unusual facility. A private facility for boys with severe physical, psychological, and emotional problems, the school was described in the District Court opinion, which the Tenth Circuit quoted, as " `not a school in the traditional, ordinary, classroom sense.' " 691 F.2d at 935. Although the school did offer classes, the District Court observed, the school was " `also a correctional and detention facility.' " While students were generally admitted at the insistence of one or both of their parents, others were "received at the school directly from juvenile courts and probation officers from across the nation." Id. at 936. Conditions at the school were unusually harsh and restrictive. Id. The District Court wrote:
 
 
 27
 Students are restricted to the grounds. Students are confined. Some students are locked in and locked up with varying degrees of personal liberty restored as each progresses through the institutional program. If a student leaves without permission, he is hunted down, taken into custody and returned. . . .
 
 
 28
 Regardless of origin, condition or motivation, once arrived, each person during the beginning phases of the school program was locked in, isolated from the outside world, and whether anti-social, crippled or learning disabled, was subject to mandated physical standing day after day after day to promote "right thinking" and "social conformity." Mail was censored. Visitors were discouraged. Disparaging remarks concerning the institution were prohibited and punished. To "graduate" from confinement to a more liberated phase, one had to "pass" a lie detector test relating to "attitude," "truthfulness" and "future conduct." Some failed to pass and remained in confinement for extended periods of time.
 
 
 29
 Id. at 935-36.
 
 
 30
 The Tenth Circuit concluded that the state "ha[d] so insinuated itself with the Provo Canyon School as to be considered a joint participant in the of fending actions." Id. at 940. The Court relied on the involuntary commitment of some students, the school's detailed contracts with the school districts, the school's receipt of substantial state funding, and extensive state regulation. See id. Recognizing that the New Perspectives School in Rendell-Baker was "indeed quite similar" to the Provo Canyon School, the Tenth Circuit attempted to distinguish the cases by noting that the plaintiffs in Rendell-Baker were employees of the school, whereas the plaintiffs in Milonas were students, "some of whom have been involuntarily placed in the school by state officials who were aware of, and approved of, certain of the practices which the district court . . . enjoined." Id. at 940.
 
 
 31
 Milonas is not binding on us, and we cannot agree entirely with the court's reasoning. The Milonas court's reliance on "significant state funding of tuition" and the detailed contracts between the school and local school districts appears to us to be squarely inconsistent with Rendell-Baker. Moreover, we are uncertain what the Milonas court had in mind when it sought to distinguish Rendell-Baker on the ground that the plaintiffs in that case were school employees, rather than students. There are, of course, circumstances in which this distinction might matter. (For example, a state directive might require a private entity to engage in the conduct challenged by a student while imposing no such requirement regarding conduct challenged by an employee.) But it is unclear why the Milonas court thought that it was important that the plaintiffs in the case before it were students. It is possible that the Milonas court took this view because it believed that some state officials "were aware of, and approved of " certain of the Provo Canyon School's practices concerning the treatment of students. It is not clear that even such awareness and approval would be enough to establish state action,[10] but if this is not what the Milonas court had in mind, the significance of the fact that the plaintiffs were students is obscure.
 
 
 32
 In any event, we need not decide whether we would agree with the Tenth Circuit on the facts presented in Milonas, because the case now before us is quite different. Here, Robert was not "involuntarily placed in the school by state officials who were aware of, and approved of " the practices attacked in Robert's complaint. Robert was enrolled at Stetson by his legal custodian and with his mother's consent, and we are aware of no evidence that any state officials were aware or approved of the conduct by the members of the Stetson staff that forms the basis of Robert's claims -- much less any evidence that they "provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the [state]." Blum, 457 U.S. at 1004; see also San Francisco Arts & Athletics v. U.S.O.C., 483 U.S. 522, 546 (1987).
 
 
 33
 Moreover, for what it is worth, there is simply no evidence that Stetson subjected its students to anything approaching the conditions at the Provo Canyon School. As far as the record here reveals, Stetson students were not placed in solitary confinement, discouraged from seeing visitors, required to take lie detector tests, or subjected to censorship of their mail. On the contrary, it is undisputed that Robert was allowed to leave campus with an instructor, had regular contact with his family (including frequent visits with his mother and step-father), was allowed to leave campus with his family, and was even allowed to go home for vacations.
 
 
 34
 Robert emphasizes the fact that Stetson students were not allowed to leave the school grounds without permission and that, if they did, the school would attempt to locate and return them, with the help of the local police department if necessary. See Appellant's Br. at 38-39. He argues that his "complete inability to leave the Stetson School without having a bench warrant issued for his detention, effectively ma[de] him a `prisoner', much more analogous to an inmate, than to any other situation." Id. at 39. In response, Stetson states:
 
 
 35
 In the event that a student were to leave campus without permission, Stetson, like all responsible private or public schools, would notify local police for the student's own welfare and for the protection of the community. Stetson would not issue a warrant and arrest order because Stetson lacked the jurisdictional basis and the legal authority on its own to invoke custodial proceedings.
 
 
 36
 Appellees's Br. at 11 (citations to appendix omitted).
 
 
 37
 Robert has not referred us to any evidence in the record that supports his assertion that the school did more than simply notify the police department if a student left without permission.[11] Nor has he referred us to any provision of Massachusetts statute or common law that gave Stetson any greater authority with respect to a missing student than is enjoyed by any of the state's other privately owned and run residential schools.
 
 
 38
 In sum, whether or not we would follow Milonas, we are satisfied that that case is easily distinguishable from the case before us. Particularly in light of the Supreme Court's decision in Rendell-Baker, we agree with the District Court that Robert failed to show that the challenged actions of the Stetson staff may be fairly attributed to the state.
 
 III.
 
 39
 Robert also challenges two evidentiary rulings made by the District Court during the trial on his state-law claims. First, he argues that the District Court erred by limiting the expert testimony of Anne Wolbert Burgess, D.N.S., who was prepared to testify that the behavior to which Robert was subjected at Stetson constituted child abuse. The District Court accepted Burgess as an expert in child abuse, but the Court ruled that an expert opinion on the question whether specific conduct constituted child abuse would not be helpful to the jury under Fed. R. Evid. 702. Moreover, the Court concluded that testimony by Burgess on this point would result in "undue delay, waste of time, or needless presentation of cumulative evidence" within the meaning of Fed. R. Evid. 403, and the Court therefore precluded such testimony. In addition, the Court ruled that Burgess was not qualified to "render an opinion diagnosing plaintiff with post-traumatic stress disorder" and that "such testimony would be unnecessarily cumulative to the testimony of plaintiff 's other experts." As a result of these rulings, Burgess's testimony was limited to the treatment that she believed would have been best for Robert.
 
 
 40
 Robert argues that the District Court erred in limiting Burgess's testimony. He claims that Burgess's testimony was offered to "help explain to the jury the ramifications, and implications, of uninvited physical contact by staff with Plaintiff, in the guise of horseplay." Robert's Brief at 52. More specifically, he argues that expert testimony was necessary to explain that children "who act out sexually" and who have been the victims of sexual abuse "are at an increased risk for harm caused by . . . uninvited inappropriate physical contact." See id. at 54. Therefore, he contends that the District Court made it impossible for him adequately to explain the seriousness of the horseplay by the Stetson staff. Id. at 55-56.
 
 
 41
 We review a District Court's decision to admit or reject testimony under Rule 403 for abuse of discretion, and, we will not reverse such a ruling "unless it is `arbitrary and irrational.' " Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 187 (3d Cir. 1990) (quoting United States v. DePeri, 778 F.2d 963, 973-74 (3d Cir. 1985)), cert. denied, 501 U.S. 1217 (1991). We hold that the District Court's ruling limiting Burgess's testimony under Fed. R. Evid. 403 was within the proper bounds of its discretion.
 
 
 42
 In addition to Burgess, two other experts testified on Robert's behalf at trial. See Stetson's Brief at 58. These two witnesses, Edward J. Doughtery and Robert Prentky, both psychologists, testified at length about the impact that the alleged physical and mental abuse of Robert could have on someone with his history. See Appendix at 303B-309B (portion of Doughtery's testimony); 739B-746B (portion of Prentky's testimony). Both experts explained that someone like Robert, who has been the victim and perpetrator of sexual abuse, is particularly susceptible to harm caused by inappropriate contact. See id. at 307B-308B (explaining that, prior to entering Stetson, Robert had a "brittle personality due to numerous problems in his early development" and that the conduct at Stetson "caused him a great deal of stress and problems"); Appendix at 744B ("Child abuse, virtually by definition, involves some violation of boundaries. . . . Survivors of childhood physical abuse grow up with an awareness, a knowledge that their personal boundaries are highly permeable, so that learning to trust the integrity of one's own boundaries is profoundly important. . . . When a therapist violates personal space of survivors, it recapitulates all of the earlier experiences that are boundary violations."). This testimony by Doughtery and Prentky addressed the same issues that Robert sought to address through Burgess's testimony. Therefore, the District Court had a reasonable basis for regarding that testimony as cumulative, and the District Court did not abuse its discretion in limiting Burgess's testimony.
 
 
 43
 Robert next maintains that the District Court erred in excluding certain evidence of prior bad acts by members of the Stetson staff. This included evidence of an incident in which a staff member (not one of the defendants) held a student over a balcony railing, evidence of an incident in which a staff member drove recklessly on campus with students in the van, evidence of the use of inappropriate language by staff members, and evidence of other incidents that did not involve Robert or the defendants. Robert argues that this evidence was not offered to show that the defendants acted in conformity with it but rather to persuade the jury that Stetson had a permissive attitude regarding inappropriate behavior directed at students by staff. See Appellant's Br. at 60-61. The District Court excluded the evidence of the reckless driving incident, the incident in which a staff member held a student over a railing, and any other prior incidents that did not involve the plaintiff. See Appendix at 23. However, the Court allowed evidence of the use of inappropriate language by any of the defendants. See id.
 
 
 44
 Because of the distinct possibility that the jury likely would have considered the excluded evidence for precisely the purpose that Fed. R. Evid. 404(b) prohibits, i.e., to show that the defendants acted in conformity with these prior bad acts on the occasions alleged by Robert, the District Court had a reasonable basis for ruling that admission of this evidence created a danger of unfair prejudice to the defendants under Fed. R. Evid. 403. In addition, since the prior acts did not involve any of the individual defendants or Robert and did not occur during the same time period as Robert's claimed abuse,[12] the District Court had a reasonable basis for concluding that the probative value of the evidence was not great and for excluding it under Rule 403.
 
 IV.
 
 45
 For the reasons discussed above, we affirm the judgment of the District Court.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Arthur L. Alarcon, United States Court of Appeals for the Ninth Circuit, sitting by designation.
 
 
 [2]
 The complaint also included claims against the City of Philadelphia, the Philadelphia Department of Human Services, and city officials. These claims are not before us in this appeal.
 
 
 [3]
 A "dependent child" is a child who:
 (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk;
 (2) has been placed for care or adoption in violation of law;
 (3) has been abandoned by his parents, guardian, or other custodian;
 (4) is without a parent, guardian, or legal custodian;
 (5) while subject to compulsory school attendance is habitually and without justification truant from school;
 (6) has committed a specific act or acts of habitual disobedience of the reasonable and lawful commands of his parent, guardian or other custodian and who is ungovernable and found to be in need of care, treatment or supervision;
 (7) is under the age of ten years and has committed a delinquent act;
 (8) has been formerly adjudicated dependent, and is under the jurisdiction of the court, subject to its conditions or placements and who commits an act which is defined as ungovernable in paragraph (6);
 (9) has been referred pursuant to section 6323 (relating to informal adjustment), and who commits an act which is defined as ungovernable in paragraph (6); or
 (10) is born to a parent whose parental rights with regard to another child have been involuntarily terminated under 23 Pa.C.S. S 2511 (relating to grounds for involuntary termination) within three years immediately preceding the date of birth of the child and conduct of the parent poses a risk to the health, safety or welfare of the child.
 42 PA. CONS. STAT. ANN. S 6302.
 
 
 [4]
 Under 42 PA. CONS. STAT. ANN. S 6351, a court may permit a "dependent child" to remain with his or her parents, guardian, or other custodian subject to such conditions as the court prescribes or transfer temporary legal custody to a private person or organization or "[a] public agency authorized by law to receive and provide care for the child."
 
 
 [5]
 According to the testimony of Richard Robertson, the Executive Director of Stetson, on one occasion a court attempted to issue an order placing a child at Stetson. The school objected and ultimately prevailed in its effort to keep the student out of Stetson.
 
 
 [6]
 Richard Robinson testified, "We don't allow T-shirts with marijuana symbols on them, we don't allow Grateful Dead T -shirts, we don't allow symbols and things that are sexualized in nature; we don't allow tank tops and short-shorts in the dining room for health code reasons."
 
 
 [7]
 Richard Robinson testified that a Stetson staff member is normally in the room with students, but not actually on the phone. According to Robinson, "Sometimes children can get very upset when they're talking to parents or relatives or whoever they're talking to on the phone, we've had children who have smashed windows and attacked staff." Appendix at 186B.
 
 
 [8]
 The anti-horseplay policy was included in the employee manual as part of a list of unacceptable behaviors. The policy provides:
 "Horseplay" or "roughhousing" is physical playing or teasing that has the real potential to lead to injury or a fight between students or between students and staff. If a staff identifies the play between students as "horseplay" or "roughhousing", the student must stop that kind of play or interacting. Too often "horseplay" or "roughhousing" leads to dangerous play or fighting.
 
 
 [9]
 The power that DHS exercised over Robert is not comparable to the power that a state exercises over a person whose liberty is restricted as a result of a criminal conviction or involuntary civil commitment. The latter power is quintessentially governmental, but a legal guardian's authority over a minor is not. The Juvenile Act, on which Robert relies, provides that temporary custody of a dependent child such as Robert may be transferred, not only to an authorized "public agency" such as DHS, see 42 PA. CONS. STAT. ANN. S 6351(a)(2)(iii), but also to "[a]ny individual resident within or without [the] Commonwealth" who is found to be qualified or to a qualified "private organization." 42 PA. CONS. STAT. ANN. S 6351(a)(2)(i) and (ii).
 
 
 [10]
 There is tension between Milonas's reliance on such awareness and approval as the basis for finding state action and the Supreme Court's holding in San Francisco Arts & Athletics v. U.S.O.C., 483 U.S. 522, 547 (1987) (quoting Blum, 457 U.S. at 1004-5), that governmental " `approval of or acquiescence in' " the challenged conduct was not enough to establish state action.
 
 
 [11]
 Robert's brief provides two citations. The first is to the first page of the transcript of the hearing before the District Court. Apparently, by citing to this page, Robert intended to cite the entire hearing. His second citation is to a page of the District Court opinion stating that "Plaintiff also proved that Stetson contacts the police when a child leaves the premises without permission." The District Court did not make any reference to the issuance of a warrant, and in the next sentence, the Court found that, despite the "obviously significant limitations on the freedom of students enrolled at Stetson," it did not believe that Stetson was "fulfilling the traditional public function of incarcerating criminals." Id. The District Court pointed out that Robert was never adjudicated a criminal, the decision to place him at Stetson was made with the advice and support of his mother, and many of the restrictions imposed on students at Stetson were no greater than those imposed at any strict private boarding school. See id.
 
 
 [12]
 The balcony incident occurred before Robert came to Stetson and the reckless driving incident occurred prior to the time when Robert claims that his abuse began.