

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2005

# Leshko v. Servis

Precedential or Non-Precedential: Precedential

Docket No. 04-2610

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation
"Leshko v. Servis" (2005). *2005 Decisions.* Paper 484.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/484

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 04-2610

————————

KAREN M. LESHKO,

Appellant

v.

GREG SERVIS; JUDY M. SERVIS; DAUPHIN COUNTY
SOCIAL SERVICES
FOR CHILDREN AND YOUTH; SANDRA MOORE,
Agency Director,
Dauphin County Social Services for Children and Youth;
DAUPHIN COUNTY; RICK WYNN, Human Services
Director, Dauphin
County; JEFFREY HASTE, Dauphin County Commissioner;
LOWMAN HENRY, Dauphin County Commissioner;
ANTHONY PETRUCCI, Dauphin
County Commissioner

_____

On appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No. 03-cv-00889
District Judge: The Honorable Yvette Kane

_____

Argued April 1, 2005

_____

Before: ALITO, SMITH, and FISHER, *Circuit Judges*.

(Filed: September 9, 2005)

_____

Joseph M. Farrell (argued)
201/203 S. Railroad Street
P.O. Box 113
Palmyra, PA 17078-0113
*Attorney for Appellant*

David P. Karamessinis (argued)
William J. Devlin, Jr. & Associates
Suite 1500 Market Street, Suite 2920
Philadelphia, PA 19102
*Attorney for Appellees*

_____

OPINION OF THE COURT
_____

2

SMITH, *Circuit Judge*.

We weave our way in this appeal through the Supreme Court's labyrinthine state action jurisprudence. The question presented is whether foster parents are state actors for purposes of liability under 42 U.S.C. § 1983. We hold that they are not.

## I.

### A.

When appellant Karen M. Leshko was two-and-a-half years old, her foster mother, appellee Judy Servis, placed her in the kitchen sink of the Servis home to wash her. Next to the sink was a large pot of exceedingly hot water. Servis left the room. Little Karen pulled the pot over on herself, sustaining severe burns across much of her abdomen, legs and mid-section. Neither Servis nor her husband sought medical treatment for Karen for more than twelve hours.

When she turned eighteen, Karen ("Leshko") sued Dauphin County (Pennsylvania) Social Services for Children and Youth, Dauphin County, and various County officials under § 1983 for depriving her of her Fourteenth Amendment right to be free from physical harm, and under state negligence and constitutional theories. Leshko also sued the Servises, alleging liability under § 1983 and state tort law. The District Court

dismissed the complaint in its entirety for failure to state a claim. Leshko appeals only the District Court's dismissal of her § 1983 claim against the Servises, inasmuch as the Court held that the Servises were not state actors.

**B.**

Leshko was placed in the Servis home in 1985 by the Dauphin County Social Services for Children and Youth after being removed from her mother. The record reveals neither the reason for Leshko's removal, nor whether Leshko's mother consented to the removal. The laws governing foster care in Pennsylvania are substantially the same today as they were in 1985. A child in Pennsylvania can be placed in foster care after being adjudicated a "dependent child." 42 Pa.C.S. § 6351; *In re Frank W.D.*, 462 A.2d 708, 711 (Pa. Super. Ct. 1983). A dependent child in Pennsylvania is one deemed by the Commonwealth to be abandoned, illegally offered for care or adoption, or lacking "proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S. § 6302; *Matter of Adoption of J. S. H.*, 445 A.2d 162, 164 (Pa. Super. Ct. 1982). Foster care is not the only option available for dependent children; a court might alternatively order a dependent child to remain with his parents or guardian under court supervision, be transferred to the custody of an authorized private organization, or be transferred to the custody of an authorized public agency. 42 Pa.C.S. §

-4-

6351; *In re Lowry*, 484 A.2d 383, 385-86 (Pa. 1984). State regulations govern the foster care relationship, and government funding is provided. *See* 35 Pa. Code § 3700; *In re Adoption of Crystal D.R.*, 480 A.2d 1146, 1150 (Pa. Super. Ct. 1984). Apparently for the first time, a Pennsylvania court held in 2002 that foster parents in Pennsylvania are county "employees" under Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa.C.S. § 8501. *Patterson v. Lycoming County*, 815 A.2d 659, 661 (Pa. Commw. Ct. 2002).[1]

## II.

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1. This Amendment governs only state action, not the actions of private citizens or organizations. *Rendell-Baker v. Kohn*, 457 U.S. 830, 837-38 (1982) (citing, inter alia, *Civil Rights Cases*, 109 U.S. 3, 11 (1883)). Section 1983 subjects to liability those who deprive persons of federal constitutional or statutory rights "under color of any statute, ordinance, regulation, custom, or usage" of a state. *See* 42 U.S.C. § 1983. We consider actions "under color

---

[1]The District Court had jurisdiction over this case under 28 U.S.C. §§ 1331, 1343. We exercise jurisdiction over the District Court's order dismissing Leshko's complaint under 28 U.S.C. § 1291. Our review of such dismissals is plenary. *Wheeler v. Hampton Township*, 399 F.3d 238, 242 (3d Cir. 2005).

-5-

of law" as the equivalent of "state action" under the Fourteenth Amendment. *Rendell-Baker*, 457 U.S. at 838; *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 169 n.1 (3d Cir. 2004). Thus, to state a claim of liability under § 1983, Leshko must allege that she was deprived of a federal constitutional or statutory right by a state actor. *See Benn*, 371 F.3d at 169-70. The Servises concede that Leshko alleges a deprivation of a constitutional right, as they must under *Nicini v. Morra*, 212 F.3d 798, 810 (3d Cir. 2000) (en banc) (holding that a state may be liable for conduct toward foster children that "shock[s] the conscience"), so this appeal turns solely on whether the Servises are state actors.

Supreme Court cases under the Fourteenth Amendment draw no "simple line" between states and private persons. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). The principal question at stake is whether there is "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Id*. (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Following the Supreme Court's guidance for answering that expansive question, we attempt to align the case at hand with the Supreme Court case most factually akin to it. *See Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 164 (3d Cir. 2001); *Brentwood Acad.*, 531 U.S. at 295 (noting that "a host of facts" can bear on the fairness of attributing action to the state and counseling that "[a]midst such variety, examples may be the best teachers"). In

-6-

adhering to that approach, "facts are crucial." *Crissman v. Dover Downs Entm't Corp.*, 289 F.3d 231, 234 (3d Cir. 2002) (en banc).

State action cases broadly divide into two factual categories. *See Brentwood Acad.*, 531 U.S. at 296. The first category involves an *activity* that is significantly encouraged by the state or in which the state acts as a joint participant. *See Blum v. Yaretsky*, 457 U.S. 991 (1982) (holding state action to be present where the state provides "significant encouragement, either overt or covert" for the activity); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982) (holding state action to be present where private citizen employed challenged state prejudgment attachment process, thus participating in the state's action). Determining state action in such cases requires tracing the activity to its source to see if that source fairly can be said to be the state. The question is whether the fingerprints of the state are on the activity itself.

The second category of cases involves an *actor* that is controlled by the state, performs a function delegated by the state, or is entwined with government policies or management. *See Pennsylvania v. Bd. of Dir. of City Trusts of Philadelphia*, 353 U.S. 230, 231 (1957) (per curiam) (holding private organization to be state actor where the organization was controlled by a state agency); *West v. Atkins*, 487 U.S. 42, 56 (1988) (holding private doctor to be state actor where, in an institutional context, he performed a function traditionally and

-7-

exclusively reserved to the state); *Brentwood Acad.*, 531 U.S. at 298 (holding ostensibly private association to be state actor because of the "pervasive entwinement of public institutions and public officials in its composition and workings"); *see also Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724 (1961) (holding private business to be state actor where there were "mutual benefits" between the state and the business). Determining state action in this category of cases consists of asking whether the actor is so integrally related to the state that it is fair to impute to the state responsibility for the action. The question here is whether the state so identifies with the individual (or entity) who took the challenged action that we deem the state's fingerprints to have been on the action.[2]

**A.**

---

[2]We of course do not suggest that a successful showing under one of the Supreme Court's actor-centered cases makes a private individual or entity an all-purpose state actor. As we have explained, while our analytical approach in such cases starts with the actor (as opposed to the action) we nevertheless cannot resolve the state action question without finally also considering the "nexus between the state and the challenged action." *Brentwood Acad.*, 531 U.S. at 288 (quotation omitted). Distinguishing between the actor-centered, versus action-centered, approaches to finding state action is thus an effort to speed identification of the most promising analytical point of departure, not to pre-select our destination.

We see no allegation in Leshko's complaint that the Commonwealth of Pennsylvania condoned the Servises' decisions to leave Leshko sitting unattended next to a pot of hot water and not to seek immediate medical attention, let alone significantly encouraged or participated in them. To the contrary, the general rule in Pennsylvania is that courts should direct dependent children to the custody of the person or organization "best suited to the safety, protection and physical, mental, and moral welfare of the child." 42 Pa.C.S. § 6351(a); *In re Lowry*, 484 A.2d at 385. Leshko notes that Pennsylvania comprehensively regulates foster care, and funds that care together with its counties, and asks that we therefore infer a sufficiently "close nexus" between the Servises and Pennsylvania that we deem their decisions to be the Commonwealth's. But the Supreme Court repeatedly has rejected that argument, *see, e.g., American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (holding that "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action"), as have we, *see, e.g., Crissman*, 289 F.3d at 244 (holding that detailed regulation and receipt of state funds, without more, do not create state action) (quotation omitted). Leshko does not allege that Pennsylvania forced or encouraged, or jointly participated in, the Services' negligent behavior, and therefore she states no claim of state action on the basis of state regulation

-9-

and funding.[3]

**B.**

While Leshko invokes the full array of actor-centered theories of state action, only one arguably applies to her case. There is no sense in which the Servises are a state agency akin to the college board in *Board of Directors of City Trusts of Philadelphia*, which held that a college board of directors was a state agency because, while privately created and endowed, the existence and activity of the board were authorized by statute. 353 U.S. at 230-31. Nor is any kind of entwinement, pervasive or otherwise, alleged between the operation of the Servis home and public institutions and officials. *See Brentwood Acad.*, 531 U.S. at 298. Further, we have expressed our resolve to limit application of *Burton*'s so-called symbiotic relationship test to cases with facts replicating *Burton*'s, *see Crissman*, 289 F.3d at 242-43, and this case does not test that resolve. *Burton* involved a private business that funneled substantial funds into

_____

[3]The Fourth Circuit has reached the same conclusion on materially similar facts, *see Milburn v. Anne Arundel County Dep't of Soc. Serv's.*, 871 F.2d 474, 479 (4th Cir. 1989) (holding that foster parents were not state actors because state "exercised no coercive power over [foster parents]; neither did it encourage them," prompting their tortious conduct), as has the Eleventh Circuit, *see Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) (same).

-10-

government coffers through a lucrative lease. 365 U.S. at 723-24. We recognize that the Servises ostensibly served the state, and they received government funds; so there may have been some mutual benefit. But that is not enough. The Supreme Court long has taught "that a private entity performs a function which serves the public does not make its acts state action." *Rendell-Baker*, 457 U.S. at 842. Given that no tangible benefit flowed to Pennsylvania through the Servises, *Benn*, 371 F.3d at 173, we have no occasion to revive *Burton*. Our focus thus narrows to whether the Servises were delegated a "traditionally and exclusively" state function. *Jackson*, 419 U.S. at 353. That is a closer question.

### 1. State "Employees" as State Actors

Leshko would like us to resolve the public function question in her favor on the simple ground that under Pennsylvania law the Servises were public employees. We cannot do so, though we acknowledge the force in her argument. In Pennsylvania, "[a]ny person who is acting or who has acted on behalf of a governmental unit, whether on a permanent or temporary basis, whether compensated or not," is an employee of that governmental unit. 42 Pa.C.S. § 8501. As we noted earlier, a Pennsylvania appellate court has held that under § 8501 foster parents are employees of the county Children and Youth Services agency that designates them foster parents. *See Patterson*, 815 A.2d at 661. The District Court dismissed Leshko's tort claim against the Servises in light of that case,

-11-

holding that the immunity provided by Pennsylvania's tort claims statute applied to the Servises as county employees. Leshko finds it "anomalous" that the Servises successfully contended in the District Court that they are employees of the County, and yet claim here not to be state actors for purposes of liability under § 1983.

We acknowledge the seeming heads-we-win-tails-you-lose aspect of the Servises' litigation strategy, but the law is on their side. It is true that the Supreme Court in *West* declared that "state employment is generally sufficient to render the defendant a state actor," 487 U.S. at 24 (quoting *Lugar*, 457 U.S. at 935 n.18), and observed that the only time it had held that a state employee was not a state actor was in the case of a public defender, who was tasked with acting as the state's adversary. *Id*. at 50 (citing *Polk County v. Dodson*, 454 U.S. 312, 325 (1981)). Nevertheless, by its own terms, *West* does not allow state definitions to dictate federal court decisions under § 1983. The doctor in *West* was employed part-time by contract with the state, but that employment did not automatically make him a state actor. The ultimate question in *West*, as in all state action cases, was whether the doctor's conduct was "fairly attributable to the State." *Id*. at 54. "It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State," the Court explained. *Id*. at 55-56.

*West*'s approach fits with the Supreme Court's teaching

-12-

that state-hired private contractors are not automatically state actors under § 1983, even if the state is their only patron. *See Rendell-Baker*, 457 U.S. at 840-41. It also accords with the principle that labels are not dispositive in state action cases. *See Brentwood Acad.*, 531 U.S. at 296. Looking to the reality over the form of the Servises' relationship with Pennsylvania, *see Crissman*, 289 F.3d at 243, it is clear that they much more closely resemble the private nursing home contractor held not to be a state actor in *Rendell-Baker* than the officials the Supreme Court has held acted under color of state law by virtue of their governmental positions. *See Monroe v. Pape*, 365 U.S. 167, 184 (1961) (police officers); *Parratt v. Taylor*, 451 U.S. 527, 535-36 (1981) (prison officials); *Zinermon v. Burch*, 494 U.S. 113, 135-36 (1990) (state hospital officials). As we rejected in *Crissman* the notion that a state law designating private actors as state "agents" makes them state actors per se, 289 F.3d at 243-44, we reject the proposition that Pennsylvania's characterization of the Servises as "employees" automatically makes them state actors. *See Rayburn v. Hogue*, 241 F.3d 1341, 1349 (11th Cir. 2001) (holding that possession of immunity from tort suit as "employees" of state does not make foster parents state actors).

### 2. Foster Care in Pennsylvania

The question remains, then, whether the Servises performed a traditionally and exclusively public function. If so, regardless of their formal designation by the state, they are state actors. The issue thus becomes precisely what function of the Servises to choose as our object of comparison. Should it be their overall duties as foster parents? Should it be their daily care for Leshko's physical needs? Should it be their decisions related to Leshko's injuries? The question is critical, for its

answer may be outcome determinative. The Supreme Court appears to employ varying approaches to this issue. Sometimes the Court seems to identify the function broadly, as in *Rendell-Baker*, which held in a teachers' suit for unlawful termination that the "education of maladjusted high school students" is not traditionally and exclusively governmental. 457 U.S. at 842. At other times, the Court takes a narrower view, as in *Blum*, which held in a patients' suit for unlawful transfer from a nursing home that "decisions made in the day-to-day administration" of the home were not traditionally and exclusively governmental. 457 U.S. at 1012. We will follow the approach in *West*, which employs the broad methodology of *Rendell-Baker*. We follow *West* because, though there are critical factual differences between *West* and the present case, the claim in that case – negligent administration of medical care – most closely parallels Leshko's. In *West*, the Supreme Court considered broadly whether the provision of medical services to injured inmates was a traditionally exclusive governmental function. 487 U.S. at 54-56; *Sullivan*, 526 U.S. at 55 (describing function considered in *West* as "provid[ing] medical treatment to injured inmates"). We thus will ask whether the provision of care to children in foster homes is a traditionally exclusive governmental function.

No aspect of providing care to foster children in Pennsylvania has ever been the exclusive province of the government.[4] Even today, while removing children from their homes and placing them with other caregivers arguably are exclusively governmental functions in Pennsylvania, the hands-

---

[4]Following the example of the Supreme Court, we look to the historical practice of the state at issue, rather than national trends. *See, e.g, Sullivan*, 526 U.S. at 55-57.

on care may be tendered by families, private organizations, or public agencies, *see* 42 Pa.C.S. § 6351, and thus is not exclusively governmental. Organized placement of children in foster homes began in late-19th century Pennsylvania as a service of private societies to protect children from cruelty. *See* LEROY ASHBY, ENDANGERED CHILDREN: DEPENDENCY, NEGLECT, AND ABUSE IN AMERICAN HISTORY 55-61 (1997).[5] The Pennsylvania Society for the Prevention of Cruelty to Children, for example, regularly removed children from their homes in the late-1800s and placed them in institutions or with other families. *Id.* at 61. Between 1880 and 1905, two organizations in Philadelphia, the Home Missionary Society of Philadelphia and the Children's Aid Society of Pennsylvania, placed some 5,400 children in foster homes. *See* Priscilla Ferguson Clement, *Families and Foster Care: Philadelphia in the Late Nineteenth Century*, *in* GROWING UP IN AMERICA: CHILDREN IN HISTORICAL PERSPECTIVE 135, 139 (N. Ray Hiner & Joseph M. Hawes, eds., 1985). "[M]ost children entrusted to the care of [these] agencies were not vagrants picked up by the police nor indigent children removed from their homes by budding social workers, but youngsters whose families deliberately relinquished them to child care agencies." *Id.* at 141-42. In 1901, Pennsylvania began supervising the placement of children in foster care and regulating that care. *See* Act of May 21, 1901, P.L. 279 ("To regulate the treatment and control of dependent, neglected, and delinquent children . . . .")

---

[5]For a brief period in the early-19th century (from 1820 to 1835), Philadelphia operated a public orphanage, but by mid-century city officials "backed away from direct responsibility for the city's poor and dependent children," and private orphanages took over. *See* ASHBY, *supra* at 27-28.

(hereinafter "Juvenile Act"); *Mansfield's Case*, 22 Pa. Super. 224, 235 (Pa. Super. Ct. 1903) (holding statute unconstitutional under Pennsylvania constitution); *Commonwealth v. Fisher*, 62 A.2d 198, 201 (Pa. 1905) (holding revised statute constitutional). Thus, while over time Pennsylvania began to administer aspects of the foster care system previously performed privately, providing hands-on care has never been, and is not now, an exclusively governmental function. *See Milburn v. Anne Arundel County Dep't of Soc. Serv's.*, 871 F.2d 474, 479 (4th Cir. 1989) (concluding, summarily, that "[t]he care of foster children is not traditionally the exclusive prerogative of the state").

### 3. Distinguishing *West*

*West* does not compel a different conclusion. We have alluded several times to *West*'s teaching and methodology; we now expressly distinguish it on its facts. In *West*, an inmate claimed under § 1983 that a part-time prison physician violated his Eighth Amendment right to be free from cruel and unusual punishment by deliberate indifference to his serious medical needs. 487 U.S. at 45. The Supreme Court agreed, and held that the prison doctor was a state actor because he performed a traditionally exclusive governmental function. Under the federal Constitution as well as under state common law, the Court explained, the state was required to provide adequate medical care to those it incarcerated. *Id*. at 54-55. The state delegated that public function to the prison doctor. *Id*. Importantly for the *West* Court, the inmate received his care at the prison hospital, and had no option of choosing medical care outside the state system. *Id*. at 55-56.

In several crucial ways, care for children in foster homes in Pennsylvania differs from the medical care for inmates considered in *West*. First, neither the federal Constitution nor the Pennsylvania Constitution requires that the state provide care for foster children. *See* PA. CONST. art. III, § 29 ("appropriations may be made for . . . assistance to mothers having dependent children"). Constitutional obligations on a state obviously are powerful evidence that the required functions are traditionally governmental, but here there are no such obligations. Instead, as we discussed above, state-supervised foster care in Pennsylvania is a creature of statute, begun in 1901 under Pennsylvania's Juvenile Act.[6] Statutory duties of even such early vintage are not traditionally governmental. *See Sullivan*, 526 U.S. at 56-57 (holding that deciding whether to suspend payment for disputed medical treatment was not a traditionally exclusive governmental function because in

---

[6]We note that as early as 1835 the Pennsylvania legislature established so-called Houses of Refuge for "incorrigible or vicious" children, and authorized aldermen or justices of the peace to commit those children to Houses of Refuge at a parent's request. *See Fisher*, 62 A.2d at 55 (referring to Act of April 10, 1835, P.L. 133); Act of April 21, 1850, P.L. 339 (incorporating an association to establish a house of refuge in Western Pennsylvania). We think the passing of the Juvenile Act is the more appropriate date for marking the beginning of Pennsylvania's management of the foster care system, however, because of the Juvenile Act's much broader application. *But see* ASHBY, *supra*, at 25 ("Although houses of refuge were mainly for delinquent youths, they contained substantial numbers of dependent and neglected children. . . . This blurring of lines between dependency and delinquency continued into the twentieth century.").

-17-

Pennsylvania before 1915 private employers made that decision without state authorization).

We recognize that the ancient concept of the sovereign as *parens patriae*, which means "parent of his or her country," BLACK'S LAW DICTIONARY 1144 (8th ed. 2004), imposed a duty on the crown to protect the people and thus made it "the supreme guardian and superintendent over all infants [i.e., children]." George B. Curtis, *The Checkered Career of* Parens Patriae*: The State as Parent or Tyrant*, 25 DE PAUL L. REV. 895, 897 (1976) (quoting *Eyre v. The Countess of Shaftsbury*, 24 Eng. Rep. 659 (Ch. 1722)).[7] And, indeed, the Pennsylvania Supreme Court seemed to allude to the common law roots of Pennsylvania's Juvenile Act when it upheld a revised version of the Act under the state constitution. *Fisher*, 62 A.2d at 56-57 ("Every statute which is designed to give protection, care and training to children, as a needed substitute for parental authority and performance of parental duty, is but a recognition of the duty of the state, as the legitimate guardian and protector of children where other guardianship fails."). While under *West* the existence of a common law duty can contribute to a finding of state action, *see* 487 U.S. at 54-55, we do not think the existence of a generalized duty, by itself, is enough to make the Servises state actors. That is because liability inheres in exercising traditionally public *functions*, not traditionally public

_____

[7]The Supreme Court has recognized the doctrine of *parens patriae* as applied to care for children. *See Reno v. Flores*, 507 U.S. 292, 304 (1993); *Schall v. Martin*, 467 U.S. 253, 265 (1984) ("Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the state must play its part as *parens patriae*.").

-18-

*duties*.  *Cf. Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978) ("While many functions have been *performed* by governments, very few have been exclusively reserved to the state.") (emphasis added).  Indeed, we have found no case in which the Supreme Court identified a traditionally exclusive public function based on powers possessed, but not traditionally exercised, by a state government.  Thus, while Pennsylvania may have had a broad duty to supply care for needy children since the formation of the Commonwealth, that duty did not become a public function until 1901 with the creation of the Juvenile Act.  And, of course, as we have explained, the hands-on provision of foster care even now is not an exclusive public function.

Second, unlike in *West*, Leshko's care was not delivered in an institutional setting.  *West* reasoned that "although the provision of medical services is a function traditionally performed by private individuals, the context in which respondent performs these services . . . distinguishes the relationship between respondent and West from the ordinary physician-patient relationship."  487 U.S. at 56 n.15.  The Court explained that the "correctional setting, specifically designed to be removed from the community, inevitably affects the exercise of professional judgment."  *Id*.  Here, of course, Leshko's environs, a private home, were apparently designed so she would *not* be removed from the community.  It is fair to say that a primary goal of foster care is to replicate as closely as possible the traditional family setting in which children are cared for and raised.  *See* 42 Pa.C.S. § 6301(b)(1) (describing purpose of Juvenile Act as being "to preserve the unity of the family whenever possible or to provide an alternative permanent family when the unity of the family cannot be maintained").  In other

-19-

contexts, we have noted that the home is a "sacrosanct" haven of refuge from the government. *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (citing *Payton v. New York*, 445 U.S. 573, 585 (1980)). Whereas in *West* the tight security-based strictures of prison life affected the "nature, timing, and form of medical care provided to inmates," 487 U.S. at 56 n.15, the Servises' care was unaffected by such pervasive institutional influences. *Cf. Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627-28 (1991) (concluding that injury caused by state action was compounded because it occurred in a courthouse).

Third, while only the state could choose Leshko's caregiver – a feature her case has in common with *West* – that obligation too is comparatively new in Pennsylvania. As we discussed earlier, in Pennsylvania, locating suitable foster homes and placing children in them traditionally was a function of private charitable organizations. *West* found it significant that "[i]t is only those physicians authorized by the State to whom the inmate may turn." 487 U.S. at 55. It simply cannot be said that, historically, foster children in Pennsylvania could only turn to caregivers authorized by the Commonwealth. While court approval typically was secured, *see* ASHBY, *supra*, at 61, substantive authorization, such as it was, was in the hands of volunteers. *See* Juvenile Act § 7 (providing for courts to commit neglected or dependent children "to the care of some suitable institution . . . or to the care of some association willing to receive it, embracing in its object the purpose of caring or obtaining homes for dependent or neglected children . . . ."); *id*. at § 15 (authorizing parents or guardians to enter an agreement with organizations incorporated in Pennsylvania "for the purpose of aiding, caring for or placing in homes such children, and being approved as herein provided, for the surrender of such

-20-

child to such association or institution, to be taken and cared for . . . or put into a friendly home"); CLEMENT, *supra* at 139 (noting that in the mid-1800s, "[p]robably any well-dressed person who appeared in the [Home Missionary Society's] office could get a child within hours," and the Children's Aid Society found homes "simply by advertising in newspapers and by 'keeping an open office'"). By contrast, the *West* Court seems to have identified the selection of prison doctors traditionally and exclusively with the state. *See West*, 487 U.S. at 55.

*Robert S.* supports our conclusion that *West* does not control the outcome here. In *Robert S.*, a private residential school contracted with local governments to rehabilitate juvenile sex offenders. 256 F.3d at 162. Robert sued the school and its employees under § 1983, alleging physical and psychological abuse. *Id.* at 163. We held that the school and its employees did not serve traditionally exclusive governmental functions because only private schools specialized in treating sex offenders. *Id.* at 166. Seeming to invoke *West*, Robert argued that he was held at the school against his will, and thus his situation was "entirely analogous to [that] of either a prisoner or mentally committed individual held against his will." *Id.* Here, it is unclear whether Leshko was voluntarily turned over to the County or was removed against her mother's will. Assuming that she was forcibly removed, as we must on this appeal of a grant of a motion to dismiss, we explained in *Robert S.* that "the power that [the local government] exercised over Robert is not comparable to the power that a state exercises over a person whose liberty is restricted as a result of a criminal conviction or involuntary civil commitment. *The latter power is quintessentially governmental, but a legal guardian's authority over a minor is not.*" 256 F.3d at 167 n.9 (emphasis added).

-21-

We reiterate that principle today as applied to foster parents.

## III.

Leshko's case resembles none of those controlling decisions where state action has been found. *West* alone makes this case close, and, as we have explained, we think Leshko's situation is distinguishable from *West*. We have observed that the traditionally exclusive public function requirement is a "rigorous standard" that is "rarely . . . satisfied," *Robert S.*, 256 F.3d at 166 (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)), and we conclude that it is not satisfied here. There is not "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself," *Brentwood Acad.*, 531 U.S. at 295 (citation and internal quotations omitted). We thus hold that foster parents in Pennsylvania are not state actors for purposes of liability under § 1983.

We therefore will affirm the judgment of the District Court.