PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

───────────

Nos. 15-2823, 16-3837, 16-3959

───────────

ANGELA BORRELL,
                              Appellant in 16-3837

v.

BLOOMSBURG UNIVERSITY


ARTHUR F. RICHER; GEISINGER MEDICAL CENTER,
                    Appellants in 15-2823

MICHELLE FICCA,
                              Appellant in 16-3959


───────────

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-12-cv-02123)
District Judge: Honorable A. Richard Caputo

───────────

Argued May 24, 2017
Before: HARDIMAN, ROTH, and FISHER, *Circuit Judges*.

(Filed: August 30, 2017)

Barry H. Dyller [Argued]
Theron J. Solomon
Dyller Law Firm
88 North Franklin Street
Gettysburg House
Wilkes-Barre, PA 18701
    *Attorneys for Plaintiff–Appellee–Cross-Appellant
    Borrell*

Thomas S. Giotto
Jaime S. Tuite [Argued]
Tiffany A. Jenca, Esq.
Buchanan Ingersoll & Rooney
301 Grant Street
One Oxford Centre, 20th Floor
Pittsburgh, PA 15219
    *Attorneys for Appellants Geisinger Medical Center
    and Arthur Richer*

John G. Knorr, III [Argued]
Maryanne M. Lewis
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120

Keli M. Neary
Pennsylvania State Police
Office of Chief Counsel
1800 Elmerton Avenue
Harrisburg, PA 17110

*Attorneys for Appellee Michelle Ficca*

Seth A. Goldberg
Philip H. Lebowitz
Duane Morris
30 South 17th Street
United Plaza
Philadelphia, PA 19103
        *Attorneys for Amicus Hospital & Healthsystem*
        *Association of Pennsylvania*

---

OPINION OF THE COURT

---

HARDIMAN, *Circuit Judge*.

This appeal—which raises questions involving the state action doctrine and the Due Process Clause of the Fourteenth Amendment—has important ramifications for private hospitals that partner with public universities. Angela Borrell, a student working at a private hospital through a public university's clinical program, was dismissed for refusing to take a drug test in violation of hospital policy. She sued under 42 U.S.C. § 1983, claiming she was deprived of her property interest in the program without due process. Contrary to the judgment of the District Court, we hold that Defendants are entitled to judgment as a matter of law.

I

In 2007, Geisinger Medical Center (Geisinger or GMC) partnered with Bloomsburg University to establish the Nurse Anesthetist Program (NAP or Program). A private

3

hospital, Geisinger runs the "Clinical Training portion of the Program" for the aspiring nurse anesthetists while Bloomsburg, a public university, teaches them in the classroom. App. 1510. The Program operates subject to a written collaboration agreement that provides, among other things, that Geisinger and Bloomsburg will cooperate by: establishing a joint admissions committee, staffing an advisory committee, agreeing on how many students to admit, approving guidelines for clinical training, and promoting and marketing the Program. In other ways, Geisinger's and Bloomsburg's principal roles in the Program remain distinct. Geisinger provides certificates upon completion of its clinic and Bloomsburg confers Master of Science degrees to students who complete both the coursework and the clinical component.

NAP students in Geisinger's clinic administer medical care to patients under the supervision of Geisinger employees. Accordingly, the collaboration agreement states that Geisinger's policies—including its drug and alcohol policy—apply to NAP students while participating in the clinic. *See* App. 1512. The agreement also provides that Geisinger has sole authority to remove an enrollee from the clinical portion of the NAP due to unsatisfactory performance or failure "to comply with applicable policies and standards of Geisinger." App. 9. Likewise, Bloomsburg's Student Handbook requires students to "comply with the drug and alcohol policies and drug testing procedures as required by agencies affiliated with the Department of Nursing," which includes Geisinger.

4

*Borrell v. Bloomsburg Univ.*, 63 F. Supp. 3d 418, 425 (M.D. Pa. 2014) (quoting policy).[1]

Geisinger's drug and alcohol policy applies to all its employees and contractors (including clinical students working there). The policy states that drug tests "may be administered upon reasonable suspicion of substance abuse, (this may include [individual] situations . . . where HR is made aware of alleged drug/alcohol use and deems it as reasonable cause to test the employee)." App. 1529. Any Geisinger worker "who refuses to cooperate in any aspect [of the testing process] . . . shall be subject to disciplinary action, including termination, for a first refusal or any subsequent refusal." App. 1527. The policy does not provide for any pre-termination hearing or process.

The Director of the NAP at all times relevant to this case was a Geisinger nurse anesthetist named Arthur Richer. In that capacity, Richer became a joint employee of Geisinger and Bloomsburg, with Bloomsburg picking up a quarter of his salary. Richer managed the clinical component of the NAP at Geisinger while Michelle Ficca (Bloomsburg's Chair of Nursing) oversaw the Program's academic component.

---

[1] Bloomsburg's Student Handbook "also sets forth a 'review process'" for students suspected of violating *its* terms. *Borrell*, 63 F. Supp. 3d at 426. The Student Nurse Anesthetist Handbook in the collaboration agreement allows students to "initiate a grievance" if they have a complaint about a disciplinary action and commits "to being reasonable in an attempt to correct [any] offense." *Id.* The purported violation in this case was of GMC's drug and alcohol policy, which provides no grievance process.

In 2012, Richer terminated Angela Borrell for violating Geisinger's drug and alcohol policy by refusing to take a drug test when asked. Borrell, who previously had been a registered nurse at GMC, enrolled in the NAP in 2011 and began her clinical work in 2012. In September 2012, another nurse reported to Geisinger's Assistant Director of the NAP that Borrell used cocaine and "acted erratically" on a recent trip to New York. *Borrell*, 63 F. Supp. 3d at 427. This claim was relayed to Richer, who had previously "noticed that Borrell appeared disheveled on a few occasions." *Id.* Richer discussed the allegation with three other GMC employees and Ficca—his counterpart at Bloomsburg. Richer and a member of Geisinger's Human Resources Department then met with Borrell and asked her to take a drug test. During this meeting, which lasted about an hour, Borrell asked several questions about the reason for the test and called her mother for advice. Borrell eventually refused to take the drug test, stating she "did not want her record to show that she submitted to a drug/urine screen." *Id.* at 428. Richer informed Borrell that she would have "no option to test later" and claims he told Borrell she might be terminated for refusing the test, but Borrell responded that she was willing to "face the consequences." Geisinger Br. 10. Borrell claims she was warned of "consequences" generally, but not termination. *Borrell*, 63 F. Supp. 3d at 428.

After consulting with Geisinger's Human Resources Department, Richer decided to dismiss Borrell from the Program the next day. He claims he did so in his capacity as Director of the clinical training portion of the NAP, and that Bloomsburg and Ficca played no part in the decision—though he informed them of it. In a September 25, 2012 letter, Richer informed Borrell that she was terminated from the NAP for

6

her refusal to take a drug test. A draft of that letter was circulated among Geisinger Human Resources, Ficca, and Richer, who "all provided comments and suggestions as to the contents of the letter." *Id.* at 429. Richer then sent a final copy to Human Resources and Ficca. The letter was printed on joint GMC/Bloomsburg stationery and Richer and Ficca signed it. Richer signed as the "Director of the NAP," and Ficca signed indicating that she "reviewed the above information and agree[d] with the decision to terminate Angela Borrell from the . . . Program." *Id.* (first alteration in original).

After she received the letter terminating her from the Program, Borrell tried to contact "Richer and others at both Geisinger and Bloomsburg . . . to state her willingness to submit to a drug test." *Id.* That request was denied. Borrell then requested, but did not receive, a formal hearing from Bloomsburg to contest her termination from the Program. Ficca replied that since Bloomsburg had to honor Geisinger's drug policy, disqualification from GMC's clinic made her ineligible to complete her coursework at Bloomsburg necessary to complete the Program.

Borrell then commenced a § 1983 action in the United States District Court for the Middle District of Pennsylvania against GMC, Richer, Bloomsburg, and Ficca for, among other things, violation of her due process right to a pre-deprivation hearing. The District Court granted Borrell's motion for summary judgment with respect to GMC, Richer, and Ficca, holding them liable for denying Borrell due process. Essential to its holding, the District Court found that GMC and Richer were state actors and that Ficca was not entitled to qualified immunity. The Court then concluded that "because Defendants deprived Borrell of a property interest

7

while acting under color of state law when they dismissed her from the NAP without due process, her motion for summary judgment as to liability on the procedural due process deprivation of property interest claim will be granted." *Id.* at 423. The case was then tried to a jury on the issue of damages. The jury awarded Borrell $415,000 in compensatory damages and $1,100,000 in punitive damages. Later granting the Defendants' remittitur motions, the District Court reduced Borrell's compensatory damages to $250,000 and her punitive damages to $750,000.

GMC, Richer, and Ficca timely appealed the adverse summary judgment along with other issues from the subsequent trial.

II

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over both "orders entered on motions for summary judgment," *Mancini v. Northampton Cty.*, 836 F.3d 308, 313 (3d Cir. 2016), and decisions regarding qualified immunity as pure legal issues, *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012).

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a summary judgment decision, "we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (citation omitted).

8

## III

The primary issue on appeal is whether GMC, Richer, or Ficca are liable for denying Borrell due process when she was dismissed from the NAP. Because (A) GMC and Richer are not state actors with respect to Richer's decision to dismiss Borrell and (B) Ficca is entitled to qualified immunity for her involvement in Borrell's termination, we hold that no Defendant is liable to Borrell.

## A

First, we must determine whether the conduct of GMC and Richer should be considered state action. "The Fourteenth Amendment governs only state conduct, not that of private citizens." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009). So Borrell's claim is not cognizable unless she was harmed "under color of law," a standard identical to the Fourteenth Amendment's "state action" requirement. *United States v. Price*, 383 U.S. 787, 794 n.7 (1966).

In *Kach*, this Court summarized "three broad tests generated by Supreme Court jurisprudence to determine whether state action exists" in close cases and they are all "fact-specific." 589 F.3d at 646. Those tests are: "(1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Id.* (alterations and citation omitted). Of seminal importance to this appeal, we have clarified that the relevant question is not whether the private actor and the state have a

close relationship generally, but whether there is "such a close nexus between the State and *the challenged action* that seemingly private behavior may be fairly treated as that of the State itself." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (emphasis added) (citation omitted). In other words, the government must be "responsible for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis omitted). And this is true even when the actor is employed by the state. As we explained in *Mark v. Borough of Hatboro*, "an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." 51 F.3d 1137, 1150 (3d Cir. 1995). Contrary to Borrell's argument, then, Richer's joint employment with Bloomsburg and GMC's partnership with Bloomsburg with respect to the Program do not "end the inquiry" on the state actor question. Borrell Br. 33.

Rather, the pertinent question is whether Richer was wearing his Geisinger hat or his Bloomsburg hat when he decided to terminate Borrell. Actions taken "in the ambit of [non–state motivated] pursuits" are excluded from state action. *Screws v. United States*, 325 U.S. 91, 111 (1945). The record shows that Richer's actions were authorized by Geisinger to enforce its drug and alcohol policy, and not pursued under any authority granted him by the state. Simply put, Richer did not need permission from Bloomsburg to fire a Geisinger worker who violated a hospital policy.

In concluding that Geisinger acted under color of state law, the District Court focused on the fact that it "was a willful participant in joint activity, the NAP, with Bloomsburg." *Borrell*, 63 F. Supp. 3d at 436. But as we noted, that should have been the beginning of the inquiry, not the end of it. The government must have also been closely

10

involved with the decision to terminate Borrell for *that action* to be "fairly attributable to the state." *Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 245 n.18 (3d Cir. 2002).

The District Court found, and Borrell argues, that Geisinger's termination of Borrell is "fairly attributable to the state" for two main reasons: (1) Richer, a joint employee of GMC and Bloomsburg, terminated Borrell via a letter on "joint Bloomsburg-Geinsinger station[e]ry"; and (2) Ficca, a Bloomsburg employee, was involved in the termination process by providing input to Richer regarding Borrell's termination letter and by signing it. *Borrell*, 63 F. Supp. 3d at 436. As discussed already, the fact that Richer was a joint employee does not answer the question of whether *his decision* to enforce GMC's drug and alcohol policy by terminating Borrell was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by . . . a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Richer's decision was to enforce the hospital's preexisting policy requiring employees to participate in drug tests when asked, and GMC had already fired four other nurses for violating the same policy. Neither Bloomsburg nor its agreement with Geisinger played any part in creating the policy enforced in this case; the agreement merely made clear that Geisinger's employee policies would govern the behavior of clinical students while they were working at the hospital.

In light of the controlling legal principles we have articulated, the question boils down to which entity—the hospital or the university—exercised the authority to terminate Borrell for a violation of Geisinger policies. The District Court concluded that because Ficca signed the termination letter and was consulted regarding its contents,

11

"Bloomsburg and Geisinger jointly participated in terminating Borrell from the NAP." *Borrell*, 63 F. Supp. 3d at 436. The Court also stated that because Richer terminated Borrell in his capacity as Director of the NAP, the decision was made under the auspices of his employment by Bloomsburg and therefore under the color of state law. *Id.* at 437.

The agreement between Geisinger and Bloomsburg indicates otherwise. It makes clear that Geisinger retained the authority to unilaterally "exclude a Student from participation in the Clinical Training" if the student doesn't comply with a GMC policy. App. 1514. And when Richer made the decision to terminate Borrell for violating hospital policy, he acted in his capacity as a GMC employee, claiming he sought to maintain nursing standards at the hospital. And his capacity was not altered merely because he discussed this decision with—and received input on his letter from—Ficca and another joint-NAP employee. "Action taken by private entities with the *mere approval or acquiescence* of the State is not state action." *Kach*, 589 F.3d at 649 (citation omitted). Ficca's signature on the termination letter purports to do nothing more than concur with Richer's decision, which is not enough for state action. Rather, the state must have "exercised control over the particular conduct that gave rise to the plaintiff's alleged constitutional deprivation." *Id.* Under the collaboration agreement, Bloomsburg had no such control.

Notwithstanding his consultation with others, Richer made the decision to fire someone working at GMC due to her violation of a preexisting policy of the hospital, and he had the authority to do so based on his position there. "[T]he authority of state officials . . . was wholly unnecessary to

12

effectuate Borrell's dismissal from the NAP." GMC Third-Step Br. 18. Accordingly, we must reverse the District Court's holding that GMC and Richer were state actors.

B

Turning to the case against Ficca, we hold that she is entitled to qualified immunity. We do so because it was not clearly established that Ficca's agreement with Richer's decision, which she reasonably believed to be within his authority as an employee of GMC, violated Borrell's constitutional rights.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If a government official—in this case, Ficca—reasonably thinks her conduct complies with the law, she is shielded from liability. *See Pearson v. Callahan*, 555 U.S. 223, 244 (2009). Ficca is entitled to qualified immunity as long as she does not violate a "clearly established" constitutional or federal right. *Sharp*, 669 F.3d at 159 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "A right is clearly established for qualified immunity purposes where its contours are 'sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right.'" *Id.* (quoting *Saucier*, 533 U.S. at 202). In other words, the application of the right to the issue at hand must be "beyond debate." *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016).

The record indicates that it is hardly "beyond debate" that Ficca violated Borrell's due process rights. Although many cases have concluded that graduate students at public universities have property interests in continuing their

13

education, *see Borrell*, 63 F. Supp. 3d at 458 (citing cases), those cases do not speak to the right of a clinical student at a private hospital to a hearing or comparable process before termination—even if the natural consequence of that termination is an inability to complete an educational program. The District Court pointed to no cases even suggesting such a right and we are aware of no such case. And the district court cases cited cannot clearly establish law for qualified immunity purposes in any event. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

Furthermore, there is no evidence of record to suggest that Ficca could have done anything to stop Richer's decision to deny additional process to Borrell before terminating her from the Program. The agreement between Geisinger and Bloomsburg states that GMC "shall have sole authority and control over all aspects of Clinical Training." App. 1512. And while the agreement requires Geisinger to notify Bloomsburg before dismissing a student, Geisinger had the unilateral authority to dismiss students from the clinical portion of the Program, which would preclude them from obtaining the certificate necessary to become a nurse anesthetist. And if Ficca had no authority over Richer's decision to terminate Borrell, a reasonable official in Ficca's position would not have known that *she* owed Borrell any more process.

As for Ficca's concurrence with Richer's decision to terminate Borrell, agreement is insufficient to demonstrate liability absent actual authority to make the decision. And without actual decisionmaking authority, Ficca's edits, suggestions, and participation in the termination letter do not amount to a constitutional violation. *Cf. McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001). Additionally, any process provided by Ficca at Bloomsburg could not have

14

forced Geisinger or Richer to change the decision to terminate Borrell from the clinical portion of the Program based on her violation of hospital policy. As Ficca notes by way of analogy, if she "had dismissed Borrell from the Program for . . . failing grades or cheating on an examination . . . no one would say that she was entitled to a hearing *from Geisinger*." *See* Ficca Br. 25. Likewise, it's not clear that Borrell was owed a hearing from Ficca before Geisinger dismissed her from the Program.

To support her claim that Ficca supervised Richer's termination decision, Borrell notes that Ficca responded affirmatively when asked: "You are one person who Mr. Richer would need to consult [before terminating a clinical student], correct?" App. 329. But in context, Ficca had claimed she did not know whether Richer was the final decisionmaker on dismissals of clinical students and merely asserted that Richer likely had to "discuss[]" any such decision with other parties to make sure he was correctly applying "policies that have been established." App. 328–29. Given the collaboration agreement's requirement that Bloomsburg had to receive notice of a termination decision, this answer does not show that Ficca had authority to prevent Richer's decision. It shows only that she had to be notified of it.[2]

---

[2] Borrell also claims that Ficca was "Richer's direct supervisor at [Bloomsburg]," and is thus liable because she "did not take any steps to prevent her subordinate Richer from sending the termination letter." Borrell Br. 61 (citing App. 553–54). But in the deposition to which Borrell refers, Richer stated only that Ficca was "above" him "[i]n the University hierarchy." App. 554. While Ficca supervised

In responding to Ficca's qualified immunity argument, Borrell seems to miss the relevant question—would a reasonable official have known that her actions violated a clearly established right? Even if, as Borrell claims, Ficca should have known that Richer's actions were disciplinary and not academic, and Borrell was thus entitled to more process from someone, this does not answer the question of whether Ficca was that person. Given all the factors discussed herein, and given her reasonable understanding that she could not have provided process for the clinical dismissal even if she thought it was necessary in the abstract, the District Court should have granted qualified immunity to Ficca.

IV

For the reasons stated, we will reverse the District Court's summary judgment and remand the case for entry of judgment in favor of Geisinger, Richer, and Ficca.

---

Richer for university business, she did not supervise him in his other capacities—such as his GMC-related supervisory duties. Nothing in the NAP agreement gave Bloomsburg or Ficca authority to control a decision by Geisinger or Richer to remove a student from GMC's clinic, and thus the Program.

*Borrell v. Bloomsburg University et al.*
*Nos. 15-2823, 16-3837, 16-3959*

---

<u>Judge Roth</u>, concurring in part and concurring in the judgment:

In regard to Part III.B, I would hold that Ficca and Bloomsburg University's participation in the dismissal of Borrell from the program was academic, not disciplinary. Although Borrell's academic marks were satisfactory, once she had been dismissed from the clinical portion of the NAP program by Geisinger, she was no longer academically qualified to complete the NAP. For that reason, she was not being dismissed from the Bloomsburg University portion of the program because she refused to take the drug test. She was being dismissed because she was no longer academically eligible to complete the program. Clearly, this action is academic, rather than disciplinary.

Moreover, because Ficca and Bloomsburg University's action in dismissing Borrell from the program was not disciplinary, she in fact received all the due process to which she was entitled. *See*, *e.g., Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 85 (1978).

1